STATE OF NORTH CAROLINA v. DANNY SYLVESTER VICK

No. COA97-1002

(Filed 21 July 1998)

**1. Search and Seizure— probable cause—officer's statement**

In a cocaine trafficking prosecution, a detective's affidavit did not mislead the magistrate issuing a search warrant and therefore did not invalidate the subsequent search of defendant's apartment where the detective stated that "after defendant left his residence he drove directly to the location and met the informant therefore the cocaine came out of defendant's apart-

**STATE v. VICK**

[130 N.C. App. 207 (1998)]

ment." Through the use of the word "therefore" the detective made clear that he had inferred that cocaine was in defendant's apartment and he did not falsely state anywhere in the affidavit that he had direct knowledge that defendant kept cocaine in his apartment.

## 2. Search and Seizure— forcible entry—time between knock-and-announce and entry

The trial court did not err by denying defendant's motion to suppress evidence recovered from his apartment where defendant contended that officers could not have reasonably believed that their admittance was being denied or unreasonably delayed after only ten to fifteen seconds. The amount of time that it is reasonable to wait between knock-and-announce and entry must depend on the particular circumstances.

## 3. Search and Seizure— inevitable discovery doctrine—improper custodial interrogation

The trial court did not err by admitting cocaine found in defendant's refrigerator where defendant's statement that the drugs were located in the refrigerator was a result of a custodial interrogation in violation of his constitutional rights, but the officers' statements revealed that it was more likely than not that they would have found the cocaine even without the initial illegal interrogation. The inevitable discovery doctrine applied to allow admission of the cocaine.

## 4. Search and Seizure— warrant—not given to person in control of premises—evidence not suppressed

The trial court did not err by denying defendant's motion to suppress cocaine found in his apartment where officers read the search warrant to defendant prior to asking any questions and prior to conducting their search, but left a copy of the warrant in the apartment at the conclusion of the search rather than giving a copy to defendant. This constitutes a violation of the plain language of N.C.G.S. § 15A-252, but the evidence in defendant's apartment was not obtained as a result of officers' failure to strictly comply with the language of the statute and would have been obtained had officers given defendant a copy of the warrant prior to their search.

Appeal by defendant from judgments dated 10 March 1997 by Judge Robert L. Farmer, and from orders dated 17 June 1997 by Judge

Narley L. Cashwell in Wake County Superior Court. Heard in the Court of Appeals 29 April 1998.

> *Attorney General Michael F. Easley, by Assistant Attorney General John G. Barnwell, for the State.*

> *George B. Currin, for defendant appellant.*

GREENE, Judge.

Danny Sylvester Vick (Defendant) appeals from the trial court's denial of his motion to suppress evidence.

In January 1996, the Raleigh Police Department Drug and Vice Task Force (Drug Task Force), a squad of the police department's narcotics unit which targets "upper level narcotics dealers and organized crime figures in this area," received information from a confidential informant that Defendant "was storing, and transporting and dealing large quantities of drugs." The informant told the Drug Task Force that:

> [Defendant] lived near Crabtree Valley Mall and he drove a blue Ford Bronco. The informant gave us some more information of which [the Drug Task Force was] able to corroborate and find the Defendant living [in an apartment near Crabtree Valley Mall] and was, in fact, driving a blue Ford Bronco . . . .

Detective A.J. Wisniewski (Detective Wisniewski) of the Drug Task Force testified that Defendant was observed making a delivery of a controlled substance to an informant on 11 March 1996. Detective Wisniewski was also present and observed Defendant deliver a controlled substance to an informant on 8 May 1996.

Detective Brad Kennon (Detective Kennon), also of the Drug Task Force, testified that on 8 May 1996, he "advised [a confidential informant] to contact [Defendant], and order fifteen hundred dollars worth of cocaine."

> [While under supervision at the police department,] the informant paged [Defendant] to the informant's pager. [Defendant], in turn, put his code in the informant's pager with his home phone number behind it. We then called [Defendant's] phone number and [Defendant] picked up the phone and took the order for the cocaine, and then briefly after taking the order for the cocaine left his residence, got into a vehicle and traveled [by himself] directly to the meeting spot [chosen by the informant and

**STATE v. VICK**

[130 N.C. App. 207 (1998)]

the Drug Task Force] and was surveilled [sic] by the helicopter and several detectives and vehicles while in [sic] route to that meet.

Detective Kennon testified that, when they arrived at the pre-arranged meeting spot:

The informant got there and he circled the block one time, because I instructed him not to be at the spot. I wanted [Defendant] to arrive first and then let the informant approach him. So the informant parked across the street and followed my instructions. And [Defendant] pulled into the parking lot where he was supposed to. There were some uniformed police officers across the street at a restaurant eating breakfast, or something. They were unrelated to the case, but it scared [Defendant]. [Defendant] pulled into the parking lot, pulled out, went down to [sic] the street to [another parking lot] and parked in the middle there, and then the informant paged him. . . . [Defendant] returned the call from a cell phone and [directed the informant to meet him at the new location].

Detective Kennon testified that he told the informant to follow Defendant's instructions, and Detective Kennon followed the inform-ant to the new location. Detective Kennon and other detectives from the Drug Task Force watched as "[Defendant] got out of his vehicle and got into the informant's vehicle, sat briefly, fifteen, twenty sec-onds, got out, got in his vehicle, left. The informant drove approxi-mately a hundred feet across the parking lot and met [Detective Kennon] and turned the evidence over." The evidence was "[a]pprox-imately thirty-two grams of powder cocaine." The informant was never out of Detective Kennon's line of sight, from the time the initial call to Defendant was made from the police department. Detective Kennon testified that he believed Defendant to be dangerous on the date of this transaction.

On 8 May 1996, after observing Defendant deliver cocaine to the informant, Detective Wisniewski prepared an affidavit in order to obtain a search warrant to search Defendant's apartment. As part of his affidavit, Detective Wisniewski stated:

Within the past 72 hours Detectives from the Raleigh Police Department were conducting surveillance of [Defendant's apart-ment]. During surveillance a confidential and reliable source con-tacted [Defendant] and ordered a quantity of cocaine. After the

order was placed [Defendant] left [his apartment] and drove directly to the location and met the informant, the informant obtained the cocaine from [Defendant]. [Defendant] then left the location. After [Defendant] left [his apartment] he drove directly to the location and met the informant therefore the cocaine came out of [Defendant's apartment].

A search warrant was issued for Defendant's apartment at approximately 2:15 p.m. on 8 May 1996. About an hour later that afternoon, after attempting unsuccessfully to obtain a pass key from Defendant's apartment manager, the search was executed by the police department's Selective Enforcement Unit (SEU), "a tactical team . . . which [makes] dynamic entries for drugs [sic] raids or static entries for building searches, and any other kind of high risk situation." The SEU team was aware, due to the Drug Task Force's surveillance of Defendant's apartment, that Defendant was in the apartment at the time the search warrant was executed.

Sergeant T.L. Shermer (Sergeant Shermer) of the SEU testified that in "approximately sixty-five percent of entries [involving drugs], . . . a firearm is recovered; at least one. And we find out that out of that number that approximately seventy to seventy-five percent of them, there's multiple weapons, firearms recovered." Sergeant Shermer testified that the SEU team takes special precautions in entries involving drugs because of the high correlation between drugs and weapons, and that the SEU team that entered Defendant's apartment was aware that Defendant was a suspected drug-dealer. Sergeant Shermer stated that the fact that "the actual covert work was being performed by the Drug Task Force . . . took me to a somewhat higher level, as far as being high risk, because . . . they usually deal with, ah—with high level drug—drug dealers and drug suppliers, drug traffickers." Sergeant Shermer testified that, in making the decision as to how long to wait before entering an apartment after the knock-and-announce procedure, his primary consideration is the safety of his officers.

It's basically for officer safety purposes. We don't want to—for people to be able to prepare, if we're going to make an entry, that could arm themselves and things such as that. We want to be as quiet as possible until the last second we make the entry, if we can. . . . My primary concern is officer safety; but as part of the operational plan, [another] concern, is destruction of evidence in the case.

**STATE v. VICK**

[130 N.C. App. 207 (1998)]

Sergeant Shermer testified that it was his decision alone to decide how long to wait after the initial knock-and-announce before forcibly entering Defendant's apartment. He stated:

> I base it on several factors. One is, again, officer safety. How long are we going to wait before we go in? If somebody could arm themselves, I've got to take that into account. If somebody has verbally or physically denied us entry; and again, basically I use it for an officer—you know, look at the officer safety is how I look at it.

Master Officer J.C. Wacenske (Officer Wacenske), a member of Sergeant Shermer's SEU team, testified that "when we search for narcotics, historically there are usually weapons involved. . . . Therefore, we heighten our state of alert, obviously, because of that relationship between weapons and narcotics." Officer Wacenske testified that it was his "specific duty . . . when we make entry . . . [to] announce[], 'Police, search warrant.' I'm also the one who checks to see if the door is unlocked, and I also knock on the door." Officer Wacenske testified that on this occasion, he knocked on Defendant's door and announced, " 'Police, search warrant' . . . and instantaneously I'm checking the handle of the door to see if the door is unlocked, and I'm also listening to see if there—or, to hear if there is any movement inside the apartment." Detective Wacenske was asked to describe how he knocked on Defendant's door, and stated: "I took with my left hand, knocked three times and announced 'Police, search warrant' in a rather loud voice to be sure I was heard." The prosecutor then asked: "And you said that instantaneously you also were checking the door knob?" Officer Wacenske responded: "Just as soon as I got done knocking I used my left hand to check to see if the door knob—the door was unlocked, which it was not." Officer Wacenske further testified that after knocking and announcing "Police, search warrant," and checking the door knob, he "turned back and looked at Sergeant Shermer just to confirm that he knew the door was locked . . . . We waited for two or three seconds at least, and then I knocked again and announced, 'Police, search warrant.' " After announcing "Police, search warrant" for the second time, Detective Wacenske "turned back and looked at Sergeant Shermer again, . . . [then Sergeant Shermer gave the order for forcible entry] and forcible entry was made at that time." On cross-examination, Officer Wacenske agreed that ten seconds "would be a fair guesstimate of the time" which elapsed between the first knock-and-announce and the forced entry into Defendant's apartment.

Sergeant Shermer testified that "[t]here was no—no movement or noise that we could hear or they could hear that somebody was attempting to open the door. There was no voice saying, 'I'm coming to the door; I'm going to open the door,' so we felt like our entry was being denied." Sergeant Shermer stated that after "approximately five to six seconds" of silence following Officer Wacenske's second knock-and-announce at Defendant's door, he instructed the SEU team to use their battering ram to make forcible entry into Defendant's apartment. On cross-examination, Sergeant Shermer agreed that "it was probably close to ten, fifteen seconds" between the initial knock-and-announce and the forcible entry of Defendant's apartment.

When the SEU team entered Defendant's apartment, he was standing near his bedroom in his underwear. The SEU team secured Defendant, who was alone in his apartment, and the Drug Task Force detectives came in to begin the actual search for cocaine.

Detective Kennon testified that when he and the other detectives entered the apartment (after Defendant was secured by the SEU team), they read Defendant the search warrant and then began their search. Detective Wisniewski testified that "I told [Defendant] if we were looking for drugs where would we look, so as to make it easier, and he said the kitchen in the refrigerator." Detective Kennon testified that they asked Defendant: "[W]here would we look if we were looking for drugs[?]" The detectives then searched the refrigerator and "found a quantity of drugs, at which time [Defendant] was placed under arrest." Detective Kennon stated that the "narcotics in the refrigerator weren't overly hid. They were just—they were in a place that we would have found, but in—to keep from doing damage or disrupting the apartment any more than we have to, sometimes we'll ask that as a courtesy to the—to the people who live there." Detective Kennon stated that the drugs "were blatantly laying [sic] in the refrigerator" and "would have been located" whether or not Defendant told them where to look. Afterwards, "we took [Defendant] into a separate bedroom and set him down and mirandized him and then asked him some questions." Detective Kennon advised Defendant of his rights, and then Defendant "indicated that he would like to talk to us, and I asked [Defendant] where he, had obtained the drugs from. He said that he had worked for another male that went by the name of 'Q' that resided in Durham, North Carolina . . . ." Subsequently, "[Defendant] started telling us stories that didn't make sense. They weren't logical, and said he didn't have the phone number for ['Q']

and different things, and we stopped questioning him." The officers arrested Defendant, and after the search was completed, the officers left a copy of the search warrant in Defendant's apartment on the dividing half-wall between his kitchen and living room.

Defendant made a motion to suppress the evidence obtained in the search of his apartment and a motion to dismiss the case against him. The trial court found that the SEU team waited "approximately 10 to 15 seconds" after the first knock-and-announce prior to forcibly entering Defendant's apartment, and concluded that the officers gave Defendant sufficient notice of their presence prior to entry. The trial court also concluded:

> [D]efendant was in custody and had not been advised nor waived his Miranda rights at the time he was asked where the drugs were located. That his response that the drugs were located in the refrigerator was made as a result of a custodial interrogation and in violation of his constitutional rights.

The trial court further concluded, however, that "the cocaine found in the refrigerator would have inevitably been discovered by lawful means without using [D]efendant's statement and therefore that the inevitable discovery doctrine applies under these circumstances to allow admission of this evidence." Based on these conclusions, the trial court denied Defendant's motion to suppress the cocaine found in Defendant's refrigerator and denied Defendant's motion to dismiss. Defendant subsequently pleaded guilty to two counts of trafficking in cocaine by transportation, two counts of trafficking in cocaine by sale and delivery, and three counts of trafficking in cocaine by possession. Defendant, however, reserved his right to appeal the trial court's order denying his motion to suppress evidence and his motion to dismiss. Defendant received two consecutive thirty-five to forty-two month sentences.

---

The issues are whether: (I) the detective made a false statement in his affidavit invalidating the ensuing search warrant; (II) waiting only ten to fifteen seconds after a knock-and-announce prior to making a forcible entry was reasonable under the circumstances; (III) the cocaine located in Defendant's refrigerator would inevitably have been discovered by the officers; and (IV) the evidence was obtained from Defendant's apartment as a result of a substantial violation of N.C. Gen. Stat. § 15A-252.

I

**[1]** [W]here the defendant makes a substantial preliminary show-ing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affi-davit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lack-ing on the face of the affidavit.

*Franks v. Delaware*, 438 U.S. 154, 155-56, 57 L. Ed. 2d 667, 672 (1978). An officer's statement, in an affidavit seeking a search warrant, that he had "been able to recover both marijuana and cocaine from inside of [the defendant's] residence, using investigative means" is a false statement where the officer has *not* been inside of the defendant's residence, and had actually recovered the drugs from the defendant's trash can *outside* of the defendant's residence. *State v. Severn*, 130 N.C. App. 319, 323, 502 S.E.2d 882, —— (1998). In *Severn*, the officer's use of the phrase "using investigative means" left the issuing magis-trate unaware that the officer had not actually recovered drugs from *inside* of the defendant's residence, as he had stated, notwithstand-ing the officer's argument that "most of the magistrates know that when . . . officers present something in this fashion . . . that it is a trash pickup." *Id.* at 321, 502 S.E.2d at ——, slip op. at 3.

In this case, Detective Wisniewski's affidavit requesting a search warrant for Defendant's apartment stated: "After [Defendant] left his residence he drove directly to the location and met the informant *therefore the cocaine came out of [Defendant's apartment]*." Defendant contends that this statement was false. We disagree. Detective Wisniewski did not falsely state anywhere in his affidavit that he had direct knowledge that Defendant kept cocaine in his apartment; rather, through the use of the word "therefore," Detective Wisniewski made clear in his affidavit that he had *inferred* that cocaine was in Defendant's apartment from the surrounding circum-stances. *See Webster's Third New International Dictionary* 2372

(1968) (defining "therefore" as "a logical implication"); *American Heritage College Dictionary* 1406 (3d ed. 1993) (defining "therefore" as "[f]or that reason or cause; consequently or hence"). Detective Wisniewski's affidavit did not mislead the issuing magistrate, and therefore does not invalidate the subsequent search of Defendant's apartment.

## II

**[2]** An officer executing a search warrant is generally required, prior to entering the premises, to "give appropriate notice of his identity and purpose to the person to be searched, or the person in apparent control of the premises to be searched." N.C.G.S. § 15A-249 (1997). After giving notice of his identity and purpose, an officer may enter a residence by force if he "reasonably believes either that admittance is being denied or unreasonably delayed or that the premises . . . is unoccupied . . . ." N.C.G.S. § 15A-251 (1997).[1]

There is no dispute that the officers in this case knocked on Defendant's door and announced their purpose prior to entering Defendant's apartment. Defendant contends, however, that the officers could not have reasonably believed that their admittance was being denied or unreasonably delayed such that forced entry was necessary after only ten to fifteen seconds. The State counters that the officers' particular knowledge of Defendant, combined with the easy disposability of cocaine and the known high likelihood that drug suppliers possess weapons, made a ten- to fifteen-second delay reasonable in this case.

The amount of time that it is reasonable to wait between knock-and-announce and entry "must depend on the particular circumstances." *State v. Gaines*, 33 N.C. App. 66, 69, 234 S.E.2d 42, 44 (1977) (announcement and entry which were "almost spontaneous" held reasonable where officers were searching for heroin; a male had hurriedly left the residence as the officers approached; and the front screen door was closed but the inner door was ajar); *see also State v. Jones*, 97 N.C. App. 189, 194, 388 S.E.2d 213, 215-16 (1990) (forcible entry "approximately one minute" after knock-and-announce reasonable where the officers "could hear people talking and a television in the apartment, but nobody came to the door"); *State v. Marshall*, 94 N.C. App. 20, 29-30, 380 S.E.2d 360, 366, *appeal dismissed and disc.*

---

1. We note that there are situations in which an officer may enter a residence without giving notice, but the State does not contend that this case presented such a situation. *See* N.C.G.S. § 15A-251.

*review denied,* 325 N.C. 275, 384 S.E.2d 526 (1989) (forcible entry "a couple of seconds" after knock-and-announce reasonable where the officer "heard the sounds of people running and faintly heard the word 'police' "; cocaine "is easily disposed of"; and "quick entry is safer for the officers"); *State v. Edwards,* 70 N.C. App. 317, 320, 319 S.E.2d 613, 615 (1984) (forcible entry thirty seconds after knock-and-announce was reasonable "since the object of the search was a quantity of powdery contraband peculiarly susceptible to being almost instantly disposed of"), *reversed on other grounds,* 315 N.C. 304, 337 S.E.2d 508 (1985).

In this case, the evidence reveals that the police officers approached Defendant's apartment during afternoon hours. The officers were aware, due to their surveillance of Defendant's apartment, that he was inside. At the time the officers were executing the search warrant, they were aware that Defendant had sold large amounts of cocaine to confidential informants on at least two recent occasions. Detective Kennon testified that he "felt like [Defendant] was dangerous the day we made entry." The officers loudly knocked on Defendant's door and announced that they were police officers executing a search warrant, waited at least "two or three seconds," and then proceeded to knock-and-announce a second time. Approximately ten to fifteen seconds elapsed between the initial knock-and-announce and the officers' forcible entry into Defendant's apartment. During this ten- to fifteen-second delay, the officers heard no sound from inside Defendant's apartment, and assumed that entry was being denied. The officers' assumption, reached after ten to fifteen seconds, that entry was being denied or unreasonably delayed was reasonable under these circumstances; therefore the trial court did not err in denying Defendant's motion to suppress the evidence recovered from Defendant's apartment.

III

[3] The trial court herein concluded as a matter of law that Defendant was in custody and had neither waived nor been advised of his rights at the time Detectives Wisniewski and Kennon asked him where the cocaine was located. The trial court further concluded that Defendant's response that the drugs were located in the refrigerator was the result of a custodial interrogation in violation of Defendant's constitutional rights. We agree with these conclusions of the trial court. We likewise agree with the trial court that the "inevitable discovery doctrine" applied to allow admission of the cocaine found in Defendant's refrigerator.

STATE v. VICK

[130 N.C. App. 207 (1998)]

"When evidence is obtained as the result of illegal police conduct, not only should that evidence be suppressed, but all evidence that is the 'fruit' of that unlawful conduct should be suppressed." *State v. Pope*, 333 N.C. 106, 113-14, 423 S.E.2d 740, 744 (1992). The United States Supreme Court has held, however, that evidence which would otherwise be excluded due to the illegal nature of its seizure may be admitted into evidence if the State proves by a preponderance of the evidence that officers would inevitably have discovered the evidence. *Nix v. Williams*, 467 U.S. 431, 444, 81 L. Ed. 2d 377, 387-88 (1984); *accord State v. Garner*, 331 N.C. 491, 500, 417 S.E.2d 502, 507 (1992) (adopting the inevitable discovery doctrine "as a logical and meaningful extension of our law").

In this case, officers testified that "the narcotics in the refrigerator weren't overly hid. . . . [T]hey were in a place that we would have found." The officers further testified that the cocaine was "blatantly laying [sic] in the refrigerator" and "would have been located." These statements reveal that it was more likely than not that the officers of the Drug Task Force would have found the cocaine lying in the refrigerator even without their initial illegal interrogation of Defendant; therefore the trial court did not err in admitting the cocaine found in Defendant's refrigerator into evidence.

IV

**[4]** Before undertaking any search or seizure pursuant to the [search] warrant, the officer must read the warrant and give a copy of the warrant application and affidavit to the person to be searched, or the person in apparent control of the premises or vehicle to be searched. If no one in apparent and responsible control is occupying the premises or vehicle, the officer must leave a copy of the warrant affixed to the premises or vehicle.

N.C.G.S. § 15A-252 (1997). Evidence discovered during a search must be suppressed if it "is obtained as a result of a substantial violation" of section 15A-252. N.C.G.S. § 15A-974 (1997); *State v. Fruitt*, 35 N.C. App. 177, 179, 241 S.E.2d 125, 126-27, *disc. review denied*, 295 N.C. 93, 244 S.E.2d 261 (1978). In determining whether a violation is substantial, courts must consider "all the circumstances," including:

a. The importance of the particular interest violated;

b. The extent of the deviation from lawful conduct;

c. The extent to which the violation was willful;

d. The extent to which exclusion will tend to deter future violations . . . .

N.C.G.S. § 15A-974(2). Even where a substantial violation has occurred, however, evidence will only be suppressed where there is a causal connection between the violation and the evidence obtained. *State v. Richardson*, 295 N.C. 309, 323, 245 S.E.2d 754, 763 (1978). "[I]f the challenged evidence would have been obtained regardless of [the] violation . . . , such evidence has not been obtained 'as a result of' such official illegality and is not, therefore, to be suppressed by reason of G.S. 15A-974(2)." *Id.*

In this case, the evidence reveals that the officers read the search warrant to Defendant prior to asking Defendant any questions and prior to conducting their search for narcotics. The evidence further reveals, however, that instead of giving Defendant a copy of the warrant application and affidavit prior to searching his apartment, the officers left a copy of the search warrant on the dividing half-wall between the kitchen and the living room of Defendant's apartment at the conclusion of their search. This constitutes a violation of the plain language of section 15A-252, which requires officers, prior to executing a search warrant, to "give a copy of the warrant application and affidavit to . . . the person in apparent control of the premises . . . to be searched." Even assuming that this violation was "substantial," however, the evidence in Defendant's apartment was not obtained "as a result" of the officers' failure to strictly comply with the language of the statute, because the evidence would still have been obtained had the officers given Defendant a copy of the warrant prior to their search. The trial court therefore did not err by denying Defendant's motion to suppress.

Having determined that the search of Defendant's apartment as conducted pursuant to a validly obtained search warrant that the officers waited a reasonable amount of time after knocking on Defendant's door and announcing their purpose prior to entering Defendant's apartment, that the drugs found in Defendant's refrigerator pursuant to an illegal interrogation would inevitably have been discovered, and that the evidence was not obtained as a result of a substantial violation of section 15A-252, we reject Defendant's final contention that the search of his apartment, as a whole, was unreasonable.

Affirmed.

Judges LEWIS and HORTON concur.