STATE OF NORTH CAROLINA v. MARION EDWARD PEARSON, JR.

No. COA00-647

(Filed 21 August 2001)

## 1. Evidence— nontestimonial identification order—hair and saliva samples—motion to suppress—statutory violations

The trial court did not err in a case where defendant pled guilty to two counts of second-degree rape by denying defendant's motion to suppress evidence of hair and saliva samples obtained from a nontestimonial identification order (NIO) even though defendant contends there were statutory violations after the NIO was obtained, because: (1) the State met the requirements of N.C.G.S. § 15A-271 establishing reasonable grounds to believe defendant committed the offenses before obtaining the NIO based on an officer's affidavit; (2) although defendant contends his right to counsel was violated, N.C.G.S. § 15A-279(d) protects subjects complying with an NIO from statements made during the procedure but does not render the results of the tests themselves inadmissible, and defendant is not seeking to suppress a statement made during the procedure; and (3) the failure to return an inventory from the NIO procedure to the judge within ninety days as required by N.C.G.S. § 15A-280 was not a substantial violation when defendant did not request an inventory or file a motion to have the products and reports of the NIO destroyed, and defendant was present during the procedure and saw what was taken from him.

## 2. Evidence— nontestimonial identification order—hair and saliva samples—motion to suppress—probable cause

The trial court did not err in a case where defendant pled guilty to two counts of second-degree rape by denying defendant's motion to suppress evidence of hair and saliva samples obtained from a nontestimonial identification order (NIO) even though defendant contends the NIO was allegedly not appropriately obtained and there was allegedly no probable cause, because: (1) although the State failed to comply with all of the safeguards provided under Article 14 of Chapter 15A of the North Carolina General Statutes, defendant still has not shown a substantial statutory violation rendering the NIO evidence inadmissible; and (2) the taking of hair and saliva samples without a showing of probable cause did not abridge either the North

Carolina or United States Constitutions when the samples are commonly seen and can be removed by the suspect rather than a technician, and the reasonableness safeguards of sample-taking were adhered to in this case.

**3. Evidence— blood sample—DNA testing—motion to suppress—search warrant**

The trial court did not err in a case where defendant pled guilty to two counts of second-degree rape by denying defendant's motion to suppress evidence of a blood sample and the DNA testing performed on the blood resulting from a 23 November 1998 search warrant, because: (1) the trial court relied on proper information to allow the search; (2) the evidence obtained from the nontestimonial identification order was not illegally obtained; and (3) there was no substantial violation of defendant's rights.

Judge Biggs dissenting.

Appeal by defendant from judgment entered 11 January 2000 by Judge Richard D. Boner in Burke County Superior Court. Heard in the Court of Appeals 26 April 2001.

*Michael F. Easley, Attorney General, by Robert C. Montgomery, Assistant Attorney General, for the State.*

*Robert C. Ervin for defendant-appellant.*

*Ann Groninger for American Civil Liberties Union of North Carolina Legal Foundation, Inc., amicus curiae.*

THOMAS, Judge.

Defendant, Marion Edward Pearson, appeals after pleading guilty as part of a plea agreement to two counts of second-degree rape. All of his assignments of error concern the trial court's denial of his pretrial motions to suppress evidence.

Defendant based those motions on three grounds. First, he argues evidence resulting from a non-testimonial identification order (NIO) more than twelve years prior to his arrest should have been suppressed by the trial court due to statutory violations after it was obtained. Second, defendant argues evidence from the NIO should have been suppressed because it was not appropriately obtained and because there was no probable cause. Third, defendant contends the

evidence resulting from a search warrant should have been suppressed because its taking was in violation of both the federal and state constitutions.

For the reasons discussed herein, we hold the trial court committed no error.

The facts are as follows: On 14 July 1985 at 1:15 a.m., Kathy Richards reported to Morganton Police that a man entered her apartment, held a knife to her throat and raped her. He then took thirty-eight dollars from her purse and left. Although she did not get a clear view of him in the dark, Richards said she thought he was a white male. She also noted he spoke with an accent and was over six feet tall. Police investigators found the screen to Richards's bathroom window had been removed. A Negroid hair unsuitable for scientific comparison was present, but there were no usable latent fingerprints. A sexual assault examination was completed at a local hospital, with evidence turned over to police investigators.

On 23 November 1985 at 1:10 a.m., Arlene K. Holden reported that a man with a dark complexion and an accent entered her apartment at the Village Creek Apartments, tied her with pantyhose, threatened her with pinking shears and then raped her. She also noted the assailant was approximately 5'8" tall and had a lean to medium build. A crime scene examination revealed a window screen had been removed from an unlocked bedroom window. Negroid body and pubic hairs were present but there were no usable latent fingerprints. Later, a sexual assault examination was completed at a local hospital, with evidence turned over to police investigators.

On 17 February 1986 at approximately 11:40 p.m., Ernestine Keyes reported that a black male with a fake Jamaican accent raped her at her Woodbridge Apartments home. The assailant also knew her children's names and where they went to school. She further noted he was from 5'8" to 5'11" tall and had an average build. He took forty dollars from her purse. A sexual assault examination was completed at a local hospital, with evidence turned over to police investigators.

After the second rape, in November 1985, police investigators began to develop defendant as a suspect in the crimes. Defendant was subsequently interviewed by investigators on 26 November 1985, 18 February 1986 and 26 March 1986. During this time period, Agent John H. Suttle (Suttle) of the North Carolina State Bureau of

STATE v. PEARSON

[145 N.C. App. 506 (2001)]

Investigation learned defendant had been seen leaving the Village Creek Apartments on 7 March 1985 after police were called concerning a "peeping tom" offense. Lieutenant James Buchanan observed a black male with a light gray or blue windbreaker and blue jeans squatting beside an air conditioning unit behind an apartment building. When the suspect saw Buchanan, he ran, losing Buchanan in a foot chase. Buchanan notified other officers on the scene to stop two cars he heard leaving the complex. Defendant was operating one of them. Officer Robert Bauer stopped defendant, who was wearing a light blue windbreaker and blue jeans. Defendant was then taken to the police station for questioning. He was subsequently charged with driving while license revoked and released.

After the rape of Keyes in February 1986, Suttle drove straight to defendant's home, where he observed that defendant's car was warmer than other parked cars, as if it had been recently driven. Keyes had also reported that defendant's son was enrolled in the day-care facility where she was the director. She stated defendant would on occasion deliver and pick up his son.

On 28 March 1986, a judge signed an NIO and, after being served with it, defendant went to the Burke County Clerk of Superior Court's office and requested court-appointed counsel. He was told one could not be appointed at that time. Allegedly, defendant also requested counsel at the Morganton Police Department on 8 April 1986 when he gave the samples of blood, pubic hair and saliva, but none was provided. In an analysis of the samples, defendant was not ruled out as a suspect. The laboratory conclusions, however, were not definite.

On 15 May 1986, defendant was arrested after crawling into a women's restroom stall while it was occupied by a female. He subsequently was sentenced to two years in prison for the offense of secret peeping. Afterwards, defendant moved to Maryland, where he was arrested for secret peeping offenses.

In March, 1998, evidence from the rapes of Holden and Keyes was resubmitted to the SBI lab. The results showed defendant's DNA was present in both sexual assault kits containing vaginal swabs from the victims. In November 1998, working with Brenda Bissette (Bissette), an SBI agent assigned to the Molecular Genetics Division, Suttle presented the DNA findings plus other information to a judge and obtained a search warrant for a new sample of defendant's blood. With that test as well singling out defendant as the perpetrator, a war-

rant for defendant's arrest was issued. True bills of indictment were eventually obtained against defendant alleging five counts of first-degree rape, two counts of first-degree sexual offense, three counts of first-degree burglary and two counts of robbery with a dangerous weapon. Defendant subsequently made three motions to suppress the evidence obtained by the NIO and the search warrant.

The trial court, at hearings on 10 and 11 January 2000, allowed defendant's motion to suppress a blood sample obtained pursuant to the 1986 NIO. Motions to suppress the other samples taken in 1986, and the blood sample taken in 1998 pursuant to the search warrant, were denied. Defendant then tendered an *Alford* plea to two counts of second-degree rape on 11 January 2000 in Burke County Superior Court. All of the other charges were dismissed by the State as part of a plea agreement.

Additionally, in the plea agreement, defendant reserved his right to appeal the trial court's rulings on his motions to suppress while the State reserved its right to reinstate all of the charges it was dismissing if the appeal proved unsuccessful.

The trial court found defendant's prior record an aggravating factor but also found mitigating factors including that he was gainfully employed and had sought preventive treatment for a "recognized sexual addiction problem." Defendant received two consecutive twenty-five year active sentences. From the convictions and sentences, he appeals.

[1] By his first assignment of error, defendant argues the trial court erred by denying defendant's motion to suppress evidence obtained from an NIO based on statutory violations. We disagree.

Section 15A-271 provides

> A nontestimonial identification order . . . may be issued by any judge upon request of a prosecutor . . . . "[N]ontestimonial identification" means identification by fingerprints, palm prints, footprints, measurements, blood specimens, urine specimens, saliva samples, hair samples, or other reasonable physical examination, handwriting exemplars, voice samples, photographs, and lineups or similar identification procedures requiring the presence of a suspect.

N.C. Gen. Stat. § 15A-271 (1999). The order may only be issued based on an affidavit establishing

(1) That there is probable cause to believe that a felony offense, or a Class A1 or Class 1 misdemeanor offense has been committed;

(2) That there are reasonable grounds to suspect that the person named or described in the affidavit committed the offense; and

(3) That the results of specific nontestimonial identification procedures will be of material aid in determining whether the person named in the affidavit committed the offense.

N.C. Gen. Stat. § 15A-273 (1999). Defendant argues there were never reasonable grounds to believe he committed the offenses and that the State failed to meet the requirements of section 15A-273(2) before obtaining the NIO. The affidavit included information that defendant was a black male, approximately 5'8" tall and "was caught by Lt. James Buchanan secretly peeping into apartments at Village Creek Apartments on March 7, 1985 around 9:00pm." Defendant claims he was never "caught" by anyone looking into apartments on that date and that Suttle, the affiant, did not have personal knowledge of the 7 March 1985 incident.

In an affidavit, "it is the long-standing rule of this Court that affidavits must be 'made on the affiant's personal knowledge.'" *Glenn-Robinson v. Acker*, 140 N.C. App. 606, 630, 538 S.E.2d 601, 618 (2000), *rev. denied*, 353 N.C. 372, —— S.E.2d —— (2001) (quoting *Singleton v. Stewart*, 280 N.C. 460, 467, 186 S.E.2d 400, 405 (1972)). Further, if an affidavit contains statements not based on an affiant's personal knowledge, the court should not consider those portions. *Moore v. Coachmen Industries, Inc.*, 129 N.C. App. 389, 499 S.E.2d 772 (1998). In the instant case, Suttle submitted statements to the judge for purposes of obtaining the NIO. Under the section describing facts which establish reasonable grounds, the application for the NIO contained the following statement: "Marion Pearson is a black male, slender and muscular, approx. 5'8" tall. Pearson was caught by Lt. James Buchanan secretly peeping into apartments at Village Creek Apartments on March 7, 1985 around 9:00pm." Both parties concede defendant was not "caught secretly peeping" into an apartment. Suttle, however, testified that he used the phrase because some police officers investigating the second rape "were familiar with that incident in March and they passed it on to us as investigators which is routine that when something major happens that anybody that thinks they might have something of benefit they come to you and tell

you." This Court has held that an officer making an affidavit for issuance of an arrest warrant may do so in reliance upon information reported to him by other officers in the performance of their duties. *State v. Harvey*, 281 N.C. 1, 187 S.E.2d 706 (1972).

An NIO, however, does not rise to the protective level of an arrest warrant. It has a lower standard than an arrest or search warrant because it has the limited purpose of being used only as an investigative tool to identify the perpetrator. *State v. Grooms*, 353 N.C. 50, 73, 540 S.E.2d 713, 728 (2000). Moreover, even if the affidavit did not have the words "secretly peeping," but rather described the "peeping" report combined with the other facts of the incident, we hold it would have still been sufficient to meet the reasonable grounds standard. The trial court found that the misrepresentation was not intentional and was reasonably drawn from the facts stated in Buchanan's report. The trial court concluded reasonable grounds existed. A trial court's conclusions of law will not be overturned if supported by competent evidence. *State v. Pugh*, 138 N.C. App. 60, 530 S.E.2d 328 (2000). We hold there is competent evidence to support this conclusion.

Defendant next argues the State substantially violated sections 15A-279(d), 15A-280 and 15A-282 of the N.C. General Statutes. We disagree.

Section 15A-279(d) entitles a subject of the NIO to have counsel present and if the person cannot afford an attorney, one will be provided. N.C. Gen. Stat. § 15A-279(d) (1999). Section 15A-280 provides that a return must be made to the judge who issued the NIO within ninety days of the procedure. N.C. Gen. Stat. § 15A-280 (1999). Section 15A-282 states that someone who has been the subject of an NIO must be provided with a copy of the results as soon as possible. N.C. Gen. Stat. § 15A-282 (1999). These statutes were in effect when the procedure took place and Suttle admitted he unknowingly violated them. However, evidence may be suppressed only if a statutory violation is substantial. N.C. Gen. Stat. § 15A-974(2) (1999). Factors utilized to examine this are a) the importance of the interest violated; b) the extent of the unlawful deviation; c) the extent to which the violation was willful; and d) the extent to which the exclusion of the evidence will deter future violations of Chapter 15A. *Id.*

First we address defendant's right to counsel. Section 15A-279(d) provides

Any such person is entitled to have counsel present and must be advised prior to being subjected to any nontestimonial identifica-

tion procedures of his right to have counsel present during any nontestimonial identification procedure and to the appointment of counsel if he cannot afford to retain counsel. No statement made during nontestimonial identification procedures by the subject of the procedures shall be admissible in any criminal proceeding against him, unless his counsel was present at the time the statement was made.

N.C. Gen. Stat. § 15A-279(d). In *State v. Coplen*, the defendant sought to suppress the results of her gunshot residue test by arguing police violated her section 15A-279(d) right to counsel by administering the test without counsel present. *Coplen*, 138 N.C. App. 48, 530 S.E.2d 313, *cert. denied*, 352 N.C. 677, 545 S.E.2d 438 (2000). The *Coplen* Court stated that

according to the plain language of section 15A-279(d), the provision protects the defendant from having statements made during the nontestimonial identification procedure used against her at trial where counsel was not present during the procedure. . . . [T]he defendant did not seek to suppress statements made during the procedure but instead sought to suppress the results of the test. We conclude that section 15A-279(d) does not afford [the] defendant any relief on the counsel issue.

*Id.* at 57-58, 530 S.E.2d at 320. Thus, section 15A-279(d) protects subjects complying with an NIO from statements made during the procedure, but does not render the results of the tests themselves inadmissible. Likewise, in the instant case, defendant is not seeking to suppress a statement made during the procedure. He argues that the presence of counsel is important to protect against unreasonable or unnecessary force or unusually long detention. While we agree the presence of counsel may be preferable, there were no allegations of unreasonable force or delay. Consequently, section 15A-279(d) affords defendant no relief. We further note that any failure to remind defendant of his right to counsel does not amount to a substantial violation where the NIO specifically informed defendant of his right to counsel, as is the case here. *State v. Satterfield*, 300 N.C. 621, 268 S.E.2d 510 (1980), *cert. denied*, 488 U.S. 957, 102 L. Ed. 2d 385 (1988).

Next, we address the ninety-day return to the court and notification of defendant. Section 15A-280 provides

Within 90 days after the nontestimonial identification procedure, a return must be made to the judge who issued the order or to a

judge designated in the order setting forth an inventory of the products of the nontestimonial identification procedures obtained from the person named in the affidavit. If, at the time of the return, probable cause does not exist to believe that the person has committed the offense named in the affidavit or any other offense, the person named in the affidavit is entitled to move that the authorized judge issue an order directing that the products and reports of the nontestimonial identification procedures, and all copies thereof, be destroyed. The motion must, except for good cause shown, be granted.

N.C. Gen. Stat. § 15A-280. The issue of whether the failure to return an inventory from an NIO procedure to the judge within ninety days is a substantial violation is properly before this Court for the first time. In looking at the factors determining a substantial violation, we find that the interest violated was minimal. We note defendant did not request an inventory or file a motion to have the products and reports of the NIO destroyed. The deviation was unlawful, but as Suttle testified, defendant was present during the procedure and saw what was taken from him. Indeed, Suttle testified defendant removed the hair and saliva himself. If the inventory return had been made, the listing would have eventually been filed simply awaiting any motion by defendant. Additionally, defendant in any event did not have a right to the destruction of the material. He could only motion for its destruction. The judge has clear authority to deny the request upon a finding of "good cause."

The trial court found Suttle's failure to observe the procedural rules was unintentional and concluded there was no substantial violation under section 15A-974(2). Again, a trial court's conclusions of law will not be overturned if supported by competent evidence. *State v. Pugh,* 138 N.C. App. 60, 530 S.E.2d 328 (2000). We therefore hold competent evidence existed to support the trial court's conclusions.

Section 15A-282 provides that "[a] person who has been the subject of nontestimonial identification procedures or his attorney must be provided with a copy of any reports of test results as soon as the reports are available." N.C. Gen. Stat. § 15A-282. In *State v. Daniels,* this Court denied a motion to suppress NIO evidence and held there was no substantial violation where the prosecution took longer than ninety days to give the defendant a copy of the results. *Daniels,* 51 N.C. App. 294, 276 S.E.2d 738 (1981). The defendant was not able to

show he was prejudiced by the delay. In the instant case, we note by the end of that ninety-day period defendant had been arrested for going into an occupied stall in a women's restroom. That incident, the fact the scientific results had not excluded defendant, plus the other evidence collected would have given the judge an adequate basis upon which to find "good cause" to retain the products.

Moreover, in *State v. Dobbins*, 306 N.C. 342, 293 S.E.2d 162 (1982), our Supreme Court held that the return requirement of section 15A-257 "has little, if anything, to do with protecting persons from unreasonable searches and seizures since the search and seizure already will have taken place. *Dobbins*, 306 N.C. at 349, 293 S.E.2d at 166.

In the instant case, defendant was given a copy of the results over twelve years later. However, in order to suppress evidence under 15A-974(2), the evidence obtained must be the result of substantial violations of section 15A-282 and the other aforementioned statutes. N.C. Gen. Stat. § 15A-974(2) (1999). The term "result" indicates a causal relationship, such as a "cause in fact" or a "but-for" relationship between the violation and the acquisition of the evidence. *State v. Hunter*, 305 N.C. 106, 286 S.E.2d 535 (1982). Since we have already held the violations were not substantial, we believe the evidence was not obtained *as a result* of any substantial violation of Chapter 15A. *See State v. Richardson*, 295 N.C. 309, 245 S.E.2d 754 (1978). Two of the violated statutes focus on post-procedure policies unrelated to *obtaining* the samples.

Further, the trial court did not err in denying defendant's motion to suppress the NIO evidence based on violations of the statute. We note section 15A-974(1) provides that evidence obtained as a result of a substantial constitutional violation be suppressed *only* if it is required to be suppressed by the constitution. N.C. Gen. Stat. § 15A-974(1) (1999).

Defendant strongly argues, from a public policy standpoint, that it is important for law enforcement to comply with the statute at issue. We agree. The logic in defendant's thesis is sound. The necessity of that compliance is inescapable.

Defendant further contends, however, the violations require suppression of the evidence in order to put law enforcement on notice that it, too, must follow the law as written. Anything less than exclusion, defendant argues, would make the statute meaningless.

We do not intend, in any way, to simply condone the statutory violations. Certainly, the processes set out should have been followed in every detail. At the same time, it is appropriate to not abdicate a close, textual reading of the statutes by divining a technical maze bound by unyielding exclusionary penalties. The combination of factors here results in our agreeing with the trial court that the violations were not substantial.

**[2]** By his second assignment of error, defendant argues the trial court erred in denying defendant's motion to suppress the NIO because the evidence was not obtained in conformity with the statutorily created, narrowly circumscribed procedures and because there was no probable cause. We disagree.

In *Davis v. Mississippi*, the U.S. Supreme Court observed that the Fourth Amendment would allow seizures for the purpose of obtaining fingerprints, with only reasonable suspicion, if the procedure would allow investigators to establish or negate a suspect's connection with the crime at hand. *Davis*, 394 U.S. 721, 22 L. Ed. 2d 676 (1969), *cert. denied*, 409 U.S. 855, 34 L. Ed. 2d 99 (1972). That case was the basis for the enactment of Article 14 of the N.C. General Statutes. *State v. Welch*, 316 N.C. 578, 342 S.E.2d 789 (1986). Hence, NIO procedures are authorized by Article 14 of Chapter 15A. The General Statutes, in the Official Commentary, state that

The [Criminal Code] Commission inserted a number of significant safeguards to accompany this procedure, including the following:

(1) The order must be served at least 72 hours in advance of the time designated for the procedures (unless the judge finds that the nature of the evidence makes it likely that the delay will adversely affect its probative value). § 15A-274.

(2) The person named may seek modification of the time and place designated in the order. § 15A-275.

(3) No one may be detained longer than is necessary to accomplish the procedures. § 15A-279(c).

(4) Extraction of any bodily fluid must be conducted by a qualified member of the health professions; the judge may order medical supervision for any of the other procedures. § 15A-279(a).

(5) No unreasonable or unnecessary force may be used in conducting the procedures. § 15A-279(b).

(6) The person named has the right to have counsel present during any procedures conducted under this section and to have counsel appointed if he cannot afford to retain one. § 15A-279(d). The order must inform the named person of these rights. § 15A-278(5).

(7) No statement made by the named person while the procedures are being conducted may be used in evidence against him unless his attorney was actually present at the time the statement was made. § 15A-279(d).

(8) The subject of the procedures must be given a copy of the results as soon as they are available. § 15A-282.

N.C.G.S.A. Ch. 15A, Subch. II, Art. 14, Refs & Annos. (1999). With the exception of the eighth safeguard, all of these were observed. We have held defendant's not expeditiously receiving the test results did not prejudice him. Consistently, we hold now that although the State failed to comply with all of the safeguards, defendant still has not shown a substantial statutory violation rendering the NIO evidence inadmissible.

Defendant further argues that the taking of pubic hair and saliva samples was without probable cause and abridged the Fourth Amendment of the United States Constitution and Article I, section 20 of the North Carolina Constitution. We disagree.

The Fourth Amendment protects against unreasonable searches and seizures. Article I, section 20 of the North Carolina Constitution provides

General warrants, whereby any officer or other person may be commanded to search suspected places without evidence of the act committed, or to seize any person or persons not named, whose offense is not particularly described and supported by evidence, are dangerous to liberty and shall not be granted.

N.C. Constitution. art. I, § 20. We note that although different language is used, there is no variance between our state search and seizure laws and federal requirements. *State v. Hendricks*, 43 N.C. App. 245, 258 S.E.2d 872 (1979), *cert. denied*, 299 N.C. 123, 262 S.E.2d 6 (1980). In *State v. Carter*, our Supreme Court held that where the police relied on an NIO to take a blood sample from a suspect in cus-

tody, there is no good faith exception to the exclusionary rule and the taking of a blood sample necessitates a search warrant. *Carter*, 322 N.C. 709, 370 S.E.2d 553 (1988).

In the instant case, the trial court concluded it was error for police to have withdrawn a blood sample from defendant without a search warrant in 1986. Bissette, who performed the lab tests, testified that the 1986 blood sample was not used in determining defendant's guilt. Defendant, however, argues *Carter* should be extended to saliva and hair samples. As we stated earlier, *Davis v. Mississippi* led to the enactment of Article 14 of Chapter 15A. *Welch*, 316 N.C. 578, 342 S.E.2d 789 (1986). In *Davis*, the U.S. Supreme Court allowed twenty-five people to be detained and fingerprinted based on evidence insufficient for an arrest. *Davis*, 394 U.S. 721, 22 L. Ed. 2d 676 (1969). The court in part based its decision on the less-intrusiveness of the search in comparison to a blood sample. *Id. Davis* notes that fingerprinting is a useful tool in determining the identity of the perpetrator and helpful because it is more reliable than eyewitness testimony or confessions. *Id.* at 727-8, 22 L. Ed. 2d at 681.

The taking of saliva and pubic hair is not as intrusive as a blood sample, which must be taken from below the body's surface. Saliva and hair are commonly seen and can be removed by the suspect rather than a technician. They can be quickly and easily removed without pain and, unlike blood removal, there is virtually no risk of medical complications. Moreover, hair and saliva are commonly deposited in public places, as hair sheds and saliva can be left while eating or when someone spits. Blood, on the other hand, is contained and is not commonly seen in public. *Davis* is limited to fingerprints but we note fingerprinting is more tedious than hair and saliva removal. Furthermore, the *Davis* safeguards as to the reasonableness of the sample-taking were adhered to here, including: 1) the evidence would aid in the criminal investigation of a crime already committed; 2) the standard used is less than probable cause; 3) the procedures would not be inconvenient or unexpected to the suspect; and 4) the procedures would be authorized in advance by a judicial official. *Id.*

Accordingly, we hold the taking of hair and saliva samples without a showing of probable cause did not abridge either the North Carolina or United States Constitutions. We further hold the trial court did not err in denying defendant's motion based on constitutional grounds to suppress the evidence resulting from hair and saliva samples.

STATE v. PEARSON

[145 N.C. App. 506 (2001)]

We note the *amicus curiae* brief argues the DNA testing of defendant's hair and saliva constitutes a search separate from the initial seizure and requires a warrant based on probable cause. That question, however, is not properly before us.

[3] By defendant's third assignment of error, he argues the blood sample and the DNA testing performed on it which resulted from the 23 November 1998 search warrant should have been suppressed under the exclusionary rule. He contends the official's decision to seek the warrant and the judge's decision to issue it was prompted by illegally obtained evidence. We disagree.

As aforementioned, the Constitution of the United States prohibits unlawful searches. U.S. Const. amend. IV. It further prohibits the introduction of derivative evidence that is the product of an unlawful search under the exclusionary rule. *Murray v. United States*, 487 U.S. 533, 101 L. Ed. 2d 472 (1988). Likewise, the North Carolina Constitution forbids unlawful searches. N.C. Const. art. I, § 20.

Suttle applied for a search warrant after Bissette told him another sample could make their results more definitive. The affidavit supporting the search warrant included the following pertinent statements: 1) all of the raped women were white females who lived in apartments; 2) twice the suspect used a "fake" accent; 3) twice the suspect entered through a window; 4) the first victim described the rapist as twenty-five to thirty-five years old and over six feet tall who she believed was an educated white male; 5) second victim described the rapist as a dark-complected, lean male about 5'8"; 6) the rapist stole money from two of the victims; 7) someone called in a "peeping tom" report on 7 March 1985 at the Village Creek Apartments; 8) a black male in a grey or light blue windbreaker was observed squatting next to an air-conditioning unit by Lt. Buchanan; 9) when the male saw Buchanan, he ran away; 10) Buchanan gave chase, but lost the male and radioed for other units to intercept anyone leaving the complex; 11) defendant, wearing a light blue windbreaker, was stopped leaving the complex; 12) defendant denied being behind the apartments and said he had come there to visit a friend who was not home; 13) defendant was taken to the police station for questioning and later charged with driving while his license was revoked; 14) in questioning on 26 November 1985, defendant said he did not know the name of the person he was attempting to visit the night of March 7, just that he was a black male with a light-skinned wife; 15) after the

third rape, when defendant was a primary suspect, Suttle drove to defendant's home and noted that the hood of defendant's car was warmer than other cars in the vicinity; 16) on 18 February 1986, defendant was re-interviewed and after a great deal of debate agreed to provide the police with fingerprints; 17) defendant's son was in the third victim's daycare; 18) the perpetrator knew the third victim's children's names; 19) the samples were taken on 8 April 1986; 20) the second victim had a Negroid pubic hair found on her sweater which exhibited both similarities and dissimilarities when compared to the sample; 21) pubic hair found on the third victim were microscopically consistent with the sample; 22) defendant served two years for entering a women's restroom at Western Piedmont Community College and secret peeping at a woman occupying a stall there by crawling inside; 23) defendant moved to Maryland; 24) defendant was arrested for another peeping offense in Maryland on 28 June 1991; 25) since 1993, defendant has been arrested five times for "peeping tom" related offenses; 26) during the time between the sample-taking and 1998, Agent Suttle waited for technology to improve; 27) only one black person in 34 million would have the same DNA match found in the second victim's vaginal swabs; 28) there was a mix of defendant's and the third victim's blood in the vaginal swabs taken from the third victim; and 29) the blood sample is needed for more definite results.

The request for the search warrant was granted on 23 November 1998. Defendant contends the trial judge relied on improper information when he allowed the search. However, because we have held the evidence obtained from the NIO was not illegally obtained and there was no substantial violation of defendant's rights, we hold the trial judge relied on proper information in allowing the search and thus, there is no constitutional violation.

For the above reasons, we conclude the trial court did not err.

NO ERROR.

Judge MARTIN concurs.

Judge BIGGS dissents.

I respectfully dissent for several reasons.

First, the application for the nontestimonial identification order was facially inadequate, in that it did not establish reasonable grounds to suspect that this defendant had committed the subject

offenses. Special Agent Suttle with the SBI sought a nontestimonial identification order on 28 March 1986. The application presented information about two sexual assaults reported in November, 1985, and in February, 1986. The affidavit in support of the application set forth the following regarding reasonable grounds to suspect that the defendant committed the offenses: that he was "a black male, slender and muscular, approx. 5'8" tall," and that "Pearson was caught by Lt. James Buchanan secretly peeping into apartments at Village Creek Apartments on March 7, 1895 around 9:00 P.M." However, the evidence in the Record tends to show the following: Three rapes occurred in Morganton between July, 1985 and February, 1986. Interviews with the victims failed to yield a consistent description of the perpetrator, who was variously described by the victims as a tall (over 6') white man, as a short (5'8") medium skinned man, and as a medium height (5'8"-5'10") black man. None of the victims suggested to law enforcement officers that the assailant was a personal acquaintance. The third victim indicated that the assailant knew the names of her children, while the others were total strangers. Thus, the affidavit supporting the application for the nontestimonial identification order relied on allegations that the defendant was the same race and general build as the assailant, and that he had been seen peeping into apartments where one of the assaults had occurred, approximately eight (8) months before the rapes discussed in the application. This information falls far short of providing reasonable grounds to suspect this defendant.

In addition, the affidavit relied on false and misleading information that was knowingly supplied by the State. The trial court found in its order that the statement that the defendant had been "caught secretly peeping" into the Village Creek apartments was "an opinion reasonably drawn" from the investigating officer's report. This finding is not supported by the testimony and evidence. During the suppression hearing, Agent Suttle testified that at the time that he applied for a nontestimonial identification order he knew that: (1) the defendant had not been observed looking into an apartment, much less "secretly peeping," but had been seen squatting near an air conditioning unit; (2) the defendant had provided an explanation for his presence at the apartments, which had been substantially verified; and (3) the incident at the apartments had occurred eight (8) months prior to either of the assaults. Suttle was also aware that a third victim had provided a different description of her assailant, much less like defendant than the two assaults that were discussed in the application. None of this information was included in the affidavit.

If an application for a nontestimonial identification order contains a false statement made intentionally or with reckless disregard for the truth, and without which there would not be reasonable grounds to suspect the defendant, then the nontestimonial identification order must be voided. *Franks v. Delaware,* 438 U.S. 154, 57 L.Ed.2d 667 (1978) (search warrant that does not establish probable cause absent false statement must be voided); *State v. Steen,* 352 N.C. 227, 536 S.E.2d 1 (2000) (challenge to false statements in search warrant affidavit requires evidence that affiant alleged false fact in bad faith). "A person may not knowingly make a false statement in good faith for the purposes of an affidavit in support of a search warrant." *State v. Severn,* 130 N.C. App. 319, 323, 502 S.E.2d 882, 885 (1998) (search warrant void where affiant stated that he had recovered controlled substances from inside defendant's house, when he actually had found them in trash outside the house). *Compare with State v. Vick,* 130 N.C. App. 207, 502 S.E.2d 871 (1998) (statement in application for search warrant held not intentionally false where officer's affidavit makes it clear that his conclusion was his opinion, inferred from observed facts). If the words "secretly peeping" were removed and the affidavit properly characterized the investigating officer's report, we would be left with this: the defendant was the same race and general size as the assailant described by two of the three victims, and had been seen after dark outside the apartment complex of one victim, some eight months prior to either of the subject offenses. Although the majority opinion sets out other facts that may have been within Agent Suttle's knowledge when he prepared the application for a nontestimonial identification order, they were not included in the affidavit or the application. A nontestimonial identification order may be issued <u>only</u> upon reasonable grounds to suspect the defendant of commission of the felonies under investigation. Our state Supreme Court has stated that "[t]he invasion of a person's body to seize blood, saliva, and hair samples is the most intrusive type of search[.]" *State v. Grooms,* 353 N.C. 50, 73, 540 S.E.2d 713, 728 (2000). Thus, while a nontestimonial identification order does not rise to the protection level of a search warrant, it must be based upon reasonable grounds. The application for the nontestimonial identification order in question did not provide the trial court with reasonable grounds to support the issuance of an order. Consequently, I believe that the trial judge erred in its denial of the defendant's motion to suppress the evidence obtained from the issuance of the 1986 nontestimonial identification order, which evidence impermissibly tainted the 1998 application for a search warrant.

STATE v. PEARSON

[145 N.C. App. 506 (2001)]

Finally, the State committed numerous statutory violations, the cumulative effect of which was to deprive the defendant of a fair trial. These include: (1) the application for a nontestimonial identification order did not contain information sufficient to provide reasonable grounds to suspect the defendant, as required by N.C.G.S. § 15A-273(2); (2) the order issued by the court did not state the facts intended to establish reasonable grounds to suspect the defendant, required by N.C.G.S. § 15A-278(4); (3) the defendant was not provided with an attorney to which he had a statutory right under N.C.G.S. § 15A-279(d), *see State v. Grooms*, 353 N.C. 50, 540 S.E.2d 713 (2000) (noting statutory right); (4) the order was not returned to the trial court within 90 days of its issuance, required by N.C.G.S. § 15A-280; (5) an inventory of nontestimonial identification procedures was not submitted to the trial court as required by N.C.G.S. § 15A-280; and (6) the defendant was not provided with a copy of the results of the nontestimonial identification procedures as soon as possible, as required by N.C.G.S. § 15A-282.

The most egregious of these statutory violations was the failure to afford the defendant an attorney during the identification procedures. This is <u>not</u> a case as suggested by the majority where the defendant was simply not *reminded* of his right to counsel. Rather, the defendant specifically asked on more than one occasion for counsel and was <u>denied</u>. The trial judge's findings of fact detailed the defendant's futile attempts to obtain counsel before the identification procedures were performed. The court concluded that the state had committed a substantial violation of statute in failing to provide defendant with counsel upon proper request. The right to counsel is so fundamental that the failure to provide counsel when required by law should be treated seriously.

If an attorney had been provided to defendant as authorized by statute, he or she would have been able to offer professional guidance regarding the defendant's legal rights. That being so, the advice of counsel would likely not be restricted to issues connected with custodial statements of an accused, but would reasonably encompass information on the legal implications of the identification procedures, the legal consequences of making a statement, the defendant's right to a copy of the results, and—most significantly—the defendant's right under N.C.G.S. § 15A-280 to seek the destruction of the products and reports of the nontestimonial procedures. The statute provides that:

... If, at the time of the return [as required within 90 days of the nontestimonial identification procedure], probable cause does not exist to believe that the person has committed the offense named in the affidavit or any other offense, the person named in the affidavit is entitled to move that the authorized judge issue an order directing that the products and reports of the nontestimonial identification procedures, and all copies thereof, be destroyed. The motion <u>must</u>, except for good cause shown, be granted. (emphasis added)

The prejudice from the failure to avail himself of the right to seek destruction of the test results is manifest; *but for* the DNA testing of the samples over ten years after the original issuance of a nontestimonial identification order, there would have been no basis for a prosecution in this case. Although the evidence collected from the defendant pursuant to the nontestimonial identification order may not have been <u>obtained</u> as a result of the violation of the defendant's right to counsel, it is a reasonable conclusion that it likely was <u>retained</u> for over a decade as a result of that violation.

While the majority concluded that each of the violations was not substantial or prejudicial, errors that may not warrant a new trial when considered separately may deprive the defendant of a fair trial when evaluated cumulatively. In this regard, the North Carolina Supreme Court has held:

Although neither of the trial court's errors, when considered in isolation, might have been sufficiently prejudicial to warrant a new trial, we are of the opinion that cumulatively they are sufficiently prejudicial that we are unable to say that defendant received a fair trial, and therefore a new trial is required.

*State v. White*, 331 N.C. 604, 610, 611, 419 S.E.2d 557, 561 (1992). *See also State v. Dilldine*, 22 N.C. App. 229, 206 S.E.2d 364 (1974) (cumulative effect of trial errors required new trial).

Even if no single statutory violation was substantial, their cumulative effect was that the defendant was subjected to the taking of hair and saliva samples without the required showing of reasonable grounds to suspect that he had committed the subject offenses; the defendant did not have an attorney present during the identification procedures; the defendant was not sufficiently informed of his rights in this situation, and; the defendant was not provided with the test results in a timely fashion, resulting in the test results and the defend-

ant's hair and saliva being preserved for over a decade, despite the absence of probable cause to charge the defendant with any offense in North Carolina during that time. The effect of the many statutory violations was to deprive the defendant of a fair trial. For these reasons, I believe the trial court erred in denying the defendant's motions to suppress the evidence obtained from the 1986 nontestimonial identification order and the 1998 search warrant. I would reverse and order a new trial.