IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-1286

Filed:  31 December 2020

Craven County, Nos. 17CRS000466-67; 17CRS051204-05

STATE OF NORTH CAROLINA

v.

MICHAEL DEVON TRIPP, Defendant.

Appeal by Defendant from order entered 8 June 2018 by Judge Charles H. Henry in Craven County Superior Court.  Heard in the Court of Appeals 13 November 2019.

*Attorney General Joshua H. Stein, by Assistant Attorney General Kristine M. Ricketts, for the State.*

*Patterson Harkavy, LLP, by Paul E. Smith, for Defendant.*

BROOK, Judge.

Michael Devon Tripp ("Defendant") appeals the trial court's order denying his motion to suppress evidence seized from a search of his person as well as to correct the judgment and commitment forms entered below.  On appeal, Defendant argues that the search and seizure were impermissible because he was not an "occupant" of the premises for which law enforcement officers possessed a valid search warrant.  Defendant further argues that there are clerical errors on his judgment and commitment forms.  For the following reasons, we reverse the order of the trial court,

vacate Defendant's convictions for trafficking heroin under file number 17CRS051205 and possession with intent to sell or deliver fentanyl under file number 17CRS000467, and remand for correction of clerical errors in the judgment and commitment forms.

## I. Factual and Procedural History

### A. Factual Background

Around 25 April 2017, the Craven County Sheriff's Office received complaints of "bad heroin" coming from 8450 U.S. Highway 17 ("8450") in Vanceboro, North Carolina, a property associated with Defendant. After receiving this information, Investigator Jason Buck, a member of the narcotics unit, arranged a controlled buy of heroin between a confidential informant and Defendant on 25 April 2017. The exchange occurred at 8450. Based on that transaction, Investigator Buck obtained a search warrant for the residence and vehicles connected to Defendant—the warrant did not authorize a search of Defendant.

Prior to the execution of the warrant, Investigator Buck led a pre-search operation planning meeting with the officers who would be involved in the search. Lieutenant John Raynor, who oversees the narcotics unit at the Craven County Sheriff's Office and who attended the briefing, testified that at every "preplanning meeting" he makes sure that the following policy is implemented during the execution of a warrant:

all persons on scene or in proximity to our scenes that we believe to be a threat are dealt with, which means that we will detain them briefly, pat them down for weapons, make sure they're not a threat to us and then one of the narcotics investigators on scene will make a determination if that person can leave or not.

He testified that those who pose "a threat" are

[a]nyone with a prior history with us, with violent history, known to carry guns, any known drug dealers that we have past history with. By nature, generally drug dealers are considered violent and by nature a majority carry guns in one nature or another, so everybody inside of a known narcotics residence or on the scene there we deal with for our safety purposes, then deem whether or not they're suspect at that point to continue further.

Lt. Raynor also testified that no decision had been made as to whether they were going to arrest Defendant for the prior day's sale of heroin, explaining that the "[d]etermination of whether or not we charge for the buy is made once we execute the search warrant."

Around 6:00 p.m. on 26 April 2017, Investigator Buck executed the warrant, accompanied by Investigator Josh Dowdy, an officer with the Craven County Sheriff's Office, and nine other law enforcement officers. The officers arrived in four vehicles. Investigator Buck testified that the operation plan "was to clear the residence [and] detain any individuals that were there on the property[.]" Investigator Buck clarified that the "property" referred to 8450. When Investigator Buck arrived, he saw several people standing at the neighboring residence, which belonged to Defendant's

grandfather, but was not able to identify who they were. During the search of 8450, officers encountered two individuals in the building along with marijuana, drug residue, and drug paraphernalia. It was not until Investigator Buck had completed the search of the residence and walked outside that he learned Defendant had been detained.

When Investigator Dowdy got out of his car, he identified Defendant—about "50, 60 yards" away—leaning against a wheelchair ramp on the front porch of his grandfather's house. Instead of searching 8450, Investigator Dowdy walked directly over to Defendant, who he testified "was the target of Investigator Buck's search warrant" and whom he believed there existed a warrant to search.

Investigator Dowdy testified that he was familiar with Defendant from prior domestic violence-related incidents: in 2011 Defendant had allegedly brandished a firearm at his wife, and in 2013 Defendant was arrested after shooting a shotgun in the air during an argument with his wife to scare her. These incidents occurred at Defendant's residence, 8420 U.S. Highway 17, not 8450. In 2012, Investigator Dowdy arrested Defendant at his grandfather's house for an assault on a female warrant.

When Investigator Dowdy arrived at Defendant's grandfather's house, he noticed for the first time that Defendant was also accompanied by his grandfather and another person. Investigator Dowdy testified that Defendant did not run away or make any furtive movements with his hands, nor did Defendant, his grandfather,

or the other individual "take any action to raise any suspicion of criminal activity on their part[.]" However, Investigator Dowdy ordered Defendant to put his hands on the ramp and patted him down for weapons "[b]ecause of [his] past experiences . . . [and f]or my safety." He also testified that it was office policy to "always pat down for weapons" whenever an officer has "contact with" somebody on a search warrant "[f]or our safety, for their safety, so nobody gets hurt."

As Investigator Dowdy patted Defendant down, he saw a plastic baggie in Defendant's right pocket because they were "so baggy" and testified that he felt a hard lump in Defendant's right pocket. Based on his training and experience, Investigator Dowdy believed the plastic baggie contained narcotics and, when he removed the baggie from Defendant's pocket, he noted that it contained an off-white powdery substance. The State Crime Lab later identified the substance to be fentanyl.

## B. Procedural History

Based on the above-described events, on 26 April 2017 Defendant was charged with trafficking heroin, possession with intent to sell or deliver fentanyl, manufacturing cocaine, possession with intent to sell or deliver marijuana, maintaining a dwelling to keep or sell a controlled substance, and possession with intent to use drug paraphernalia. On 3 May 2017, Defendant was charged with possession with intent to sell or deliver fentanyl and possession with intent to sell or

deliver heroin—these charges were unrelated to the 26 April 2017 offenses—and receiving stolen goods.

Defendant filed a motion to suppress evidence related to the 26 April 2017 search of his person—specifically for the charges of trafficking heroin, trafficking fentanyl, manufacturing cocaine, possession with intent to sell or deliver marijuana, and possession with intent to sell or deliver fentanyl—which the trial court denied by written order on 8 June 2018. The trial court made the following findings of fact and conclusions of law:

> 1. Investigator Jason Buck, a sworn law enforcement officer with the Craven County Sheriff's Office and a member of the Coastal Narcotics Enforcement Team, utilized a confidential informant which he found to be reliable to make a controlled purchase of heroin from the defendant, Michael Tripp, on April 25, 2017. The informant was equipped with video and audio equipment from which law enforcement could monitor the transaction. The defendant, who was known by law enforcement as a drug dealer in the Vanceboro area by reputation and criminal history, was identified by the informant and later verified by the recordings as the defendant and the seller of a quantity of heroin to the informant. The sale was made from within the defendant's residence . . . in Vanceboro, North Carolina.
>
> 2. As a result of that investigation, Deputy Buck obtained on April 26, 2017 a search warrant for that residence and several motor vehicles associated with that address from Superior Court Judge Benjamin Alford.
>
> 3. At approximately 6:00 p.m. on April 26, 2017 eleven officers with the Craven County Sheriff's Office and

Coastal Narcotics Enforcement Team executed that search warrant for that residence.

4. Prior to the execution of the search warrant an operation plan meeting was held by the officers conducting the operation. The plan was to clear the residence and detain all who were present. The residence to be searched was on a dirt road contiguous to homes resided in by other members of the defendant's family. The officers utilized four unmarked vehicles to get to that location. The officers had not obtained an arrest warrant for the defendant prior to the operation.

5. Deputy Josh Dowdy, a nine year veteran of the sheriff's office and a trained member of the Coastal Narcotics Enforcement Team, participated in the execution of the search warrant. Dowdy understood that the target of the search was the defendant. He knew the defendant from at least three other inter[actions] with the defendant. In 2011 and 2013 he had been called to the defendant's residence due to domestic disturbances in which the defendant had been brandishing a firearm. In 2012 he had arrested the defendant for an assault on a female. At the time of that arrest, he was at his grandfather's house which is located about 60 yards from the residence being searched pursuant to the April 26, 2017 search warrant.

6. The Craven County Sheriff's Office had a policy described by Lt. John Raynor that required that all people who are "on scene" or "in proximity to our scene" whom they believe to be a threat or had previously dealt with be detained and briefly patted down for weapons to make sure they are not a threat to any of the narcotics officers. The policy provided that anyone who had a prior violent history, [was] known to carry firearms, or sold narcotics were deemed to be threats.

7. When the narcotics officers arrived at [the residence] in Vanceboro, North Carolina, the defendant was outside at his grandfather's house within sixty yards of the residence

to be searched and had a direct line of sight to it and the officers on scene.

8. As Deputy Dowdy was getting out of his motor vehicle he observed the defendant to his right near the front porch of the defendant's grandfather's house. Because of his past experiences with the defendant, his previous firearm possessions, and the reasons that brought law enforcement to this residence, Dowdy asked him to put his hands on the railing of a handicap ramp attached to his grandfather's house so he could "pat" him down for weapons. It was the policy and normal procedure of the Sheriff's Office for the safety of the officers and those present to pat down all individuals with whom they made contact while executing a search warrant. The defendant complied.

9. The defendant was wearing baggy jogging pants. While patting him down Dowdy could feel what he thought was money in his left pocket. Because his pants were so "baggy[,]"[ ] Dowdy could see, without manipulating the garment, a plastic baggie in his right pants pocket, and while patting him down he felt a large lump associated with that baggie. His training and experience allowed him to reasonably conclude that the plastic baggie in the defendant's pocket contained narcotics. As a result Dowdy removed the bag and its contents. Dowdy had concluded that the plastic baggie was consistent with how narcotics are carried and packaged. He was also acutely aware of the reasons that they were searching the defendant's residence.

10. The baggie contained a white powdery substance which Dowdy concluded was a controlled substance. The defendant was handcuffed and detained and walked over to his residence. He would be later charged with multiple counts of trafficking in heroin and felonious possession of fentanyl and marijuana. The search of the defendant resulted in the seizure of 7.01 grams of schedule I heroin and the schedule II opiate, fentanyl. The search of [the]

residence resulted in the seizure of drug paraphernalia and marijuana.

Based upon the foregoing the court concludes as a matter of law that:

1. That there was probable cause on April 26, 2017 for the issuance of the search warrant for [the address identified in the search warrant] on U.S. Highway 17 in Vanceboro, N.C.

2. Deputy Dowdy was unaware there existed probable cause to arrest the defendant without a warrant for the previous day's felonious sale of heroin to Deputy Jason Buck's confidential informant. N.C. Gen. Stat. §15A-401(b)(2)(a).

3. Under the circumstances then existing, Deputy Dowdy conducted a limited "frisk" or search for weapons of the defendant which was reasonable and constitutional. *State v. Long*, 37 N.C App. 662, 668-69, 246 S.E.2d 846, 851 (1978).

4. Dowdy had reasonable suspicion and was justified from the totality of the circumstances and his previous experience with the defendant in believing that the defendant, who was the subject of multiple narcotics sale investigations, was armed and could pose a danger to those law enforcement officers who were conducting the search of the defendant's residence. *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968).

5. Because the defendant had made a sale of heroin to an undercover informant the previous day and was the occupant of the premises searched, it was likely he was going to be detained while the search was conducted. An officer executing a warrant directing a search of premises not open to the public may detain any person present for such time as is reasonably necessary to execute the warrant. If the warrant fails to produce the items named

the officer may then search any person present at the time of the officer's entry to the extent reasonably necessary to find the property described in the warrant. N.C. Gen. Stat. §15A-256. The defendant, even if the narcotics had not been uncovered by Dowdy, would have faced such a search under that statute or pursuant to his arrest [for the] sale of heroin and for what was found in the residence. The search of the residence did not apparently result in finding any appreciable amount of heroin.

6. The bag containing heroin had been located in the defendant's baggy pants pocket which Deputy Dowdy could see into when he frisked the defendant. At that time Dowdy had legal justification to be at the place and in the position he was when he saw the baggie in plain view. Its discovery was inadvertent as it was discovered during the pat down. The baggie was immediately apparent to Dowdy to be evidence of a container for illegal narcotics and would warrant a man of reasonable caution in believing the defendant was in possession of drugs and was hiding evidence which would incriminate him. The plain view doctrine was applicable in this case and all the elements were present. *State v. Peck*, 305 N.C. 734, 743, 291 S.E. 2d 637, 642 (1982).

7. After Dowdy observed the baggie and had felt the pocket during his pat down for weapons, because of the totality of the circumstances known to him at the time, he had probable cause to seize the baggie and its contents and later place him under arrest.

On 2 July 2018, in exchange for dismissal of the remaining charges, Defendant pleaded guilty to four of the April offenses—trafficking heroin, possession with intent to sell and deliver fentanyl, maintaining a dwelling, and receiving stolen goods—and the two May offenses—possession with intent to sell or deliver fentanyl and possession with intent to sell and deliver heroin—preserving his right to appeal the

denial of his motion to suppress. That same day, the trial court consolidated the two May offenses into a single active sentence of 8 to 19 months and consolidated the four April offenses into an active sentence of 70 to 90 months, to run consecutively.

After entry of the judgment, Defendant gave oral notice of appeal in the following exchange:

> [DEFENSE COUNSEL]: Thank you, Judge, and on behalf of [Defendant] on the record, I would like to announce that he's going to give notice of appeal to the Court's judgment.
>
> THE COURT: Okay. Previous order that I referred to will be entered.[1]

## II. Analysis

On appeal, Defendant argues that the trial court erred in denying his motion to suppress evidence seized during the search of his person because he was not an "occupant" of the premises to be searched. Defendant further argues that the judgment and commitment forms contain clerical errors requiring remand and correction. We consider each argument in turn.

### A. Motion to Suppress

We first turn to whether the trial court erred in denying Defendant's motion to suppress. Defendant challenges several findings of fact and argues that Investigator

---

[1] Defendant filed a petition for writ of certiorari for this Court to allow review of all the counts to which he pleaded guilty in the event we were to determine his notice of appeal was defective. We dismiss Defendant's petition as moot because his oral notice of appeal was adequate to notice appeal of all counts since the trial transcript makes clear that the notice applied to his entire guilty plea.

Dowdy lacked the right to detain him under either *Michigan v. Summers* or *Terry v. Ohio*. The State argues that the detention was permissible pursuant to *Summers* and, even if it was impermissible, evidence seized from Defendant's person would have been admissible under the inevitable discovery doctrine.

## i. Standard of Review

Our review of a trial court's denial of a motion to suppress "is strictly limited to determining whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982). "In addition, the trial court's unchallenged findings of fact are binding on appeal." *State v. Ramseur*, 226 N.C. App. 363, 366, 739 S.E.2d 599, 602 (2013). "This Court reviews conclusions of law stemming from the denial of a motion to suppress *de novo*. . . . Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Borders*, 236 N.C. App. 149, 157, 762 S.E.2d 490, 498-99 (2014) (citation omitted).

## ii. Findings of Fact

Defendant challenges several of the trial court's findings of fact as not supported by competent evidence. We assume without deciding that each of the

challenged findings is supported by competent evidence because, even if so, they cannot support Defendant's detention pursuant to either *Summers* or *Terry*.

### iii. *Summers* Detention

In *Michigan v. Summers*, 452 U.S. 692, 705, 101 S. Ct. 2587, 2595, 69 L. Ed. 2d 340, 351 (1981), the United States Supreme Court held "for Fourth Amendment purposes . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." In *Bailey v. United States*, 568 U.S. 186, 201, 133 S. Ct. 1031, 1042, 185 L. Ed. 2d 19, 33 (2013), the Supreme Court "[l]imit[ed] the rule in *Summers* to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant[.]" This constraint "ensures that the scope of the detention incident to a search is confined to its underlying justification. Once an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the intrusiveness of the detention is more severe." *Id.*

Our Supreme Court in *State v. Wilson*, 371 N.C. 920, 924, 821 S.E.2d 811, 815 (2018) (internal marks, alterations, and citations omitted), identified three parts to the *Summers* rule: "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain (1) the occupants, (2) who are within the immediate vicinity of the premises to be searched, and (3) who are present

during the execution of a search warrant[.]"  "These three parts roughly correspond to the 'who,' 'where,' and 'when' of a lawful suspicionless seizure incident to the execution of a search warrant."  *Id.*  The *Wilson* Court focused on defining who qualifies as an "occupant" and ultimately concluded that "a person is an occupant for the purposes of the *Summers* rule if he poses a real threat to the safe and efficient execution of a search warrant."  *Id.* at 925, 821 S.E.2d at 815 (citation and marks omitted).

Applying this three-part test, the Court held that a defendant was lawfully detained where he had penetrated a police perimeter when law enforcement was in the process of actively securing a home in order to execute a search warrant.  *Id.* at 921, 821 S.E.2d at 812-13.  The defendant walked past one officer and attempted to pass another, claiming he had to retrieve his moped from the home.  *Id.* at 925, 821 S.E.2d at 815.  Officers detained and frisked him and recovered a firearm.  *Id.* at 921, 821 S.E.2d at 813.  Since the defendant was seized during the execution of a search warrant and he "was seized within the immediate vicinity of the premises being searched[,]" the Court held he clearly met the "when" and "where" prongs of *Summers*.  *Id.* at 924-25, 821 S.E.2d at 815 (noting the "defendant was well within the lawful limits of the property containing the house being searched" and "could easily have accessed the house" had he not been stopped).  As to the "who" prong, the Court held that the defendant was an occupant of the premises to be searched.  *Id.* at

925-26, 821 S.E.2d at 815-16. Because "[h]e approached the house being swept, announced his intent to retrieve his moped from the premises, and appeared to be armed[,]" he posed "a real threat to the safe and efficient execution of" the search warrant. *Id.* "[S]tated another way, defendant would have *occupied* the area being searched if he had not been restrained." *Id.* at 925, 821 S.E.2d at 815.

In *State v. Thompson*, 267 N.C. App. 101, 832 S.E.2d 510 (2019), on remand from our Supreme Court in light of its decision in *Wilson*, *see State v. Thompson*, 372 N.C. 48, 822 S.E.2d 616 (2019) (per curiam), this Court further clarified who constitutes an "occupant" for purposes of the *Summers* rule. Law enforcement officers arrived at an apartment in Charlotte to execute a search warrant of a woman and encountered the defendant, who was cleaning his car in the street adjacent to the apartment. *Thompson*, 267 N.C. App. at 102, 832 S.E.2d at 511. He told officers that he did not live in the apartment, but his girlfriend did. *Id.* After searching the apartment, officers searched the defendant's car and found marijuana, drug paraphernalia, and a firearm in the trunk. *Id.* at 103, 832 S.E.2d at 511.

Concluding that there was "no question" that the defendant was detained during the execution of a search warrant and granting that it was "arguable that the circumstances [ ] satisfied the second prong—the 'where'—of the *Summers* rule[,]" this Court nonetheless concluded that the defendant was not an occupant of the searched premises. *Id.* at 108, 832 S.E.2d at 515.

> At no point did [the d]efendant attempt to approach the apartment. Nor did he exhibit nervousness or agitation, disobey or protest the officers' directives, appear to be armed, or undertake to interfere with the search. . . . Quite simply, there were no circumstances to indicate that [the d]efendant would pose "a real threat to the safe and efficient execution" of the officers' search.

*Id.* at 108-09, 832 S.E.2d at 515 (internal citations, marks, and footnotes omitted). Our Court based its decision, as our Supreme Court did in *Wilson*, on whether the defendant "'pose[d] a *real* threat to the safe and efficient execution of the officers' search[,]'" not whether he *could* have posed a threat. *Id.* (emphasis added) (marks omitted) (quoting *Wilson*, 371 N.C. at 925, 821 S.E.2d at 815); *see also Bailey*, 568 U.S. at 201, 133 S. Ct. at 1042 (considering the same).

Our Court also emphasized the importance of distinguishing between the first and second prongs of the *Summers* rule, noting that "an individual's presence within the immediate vicinity of a search" cannot operate categorically to pose "a threat to the search's safe and efficient execution." *Thompson*, 267 N.C. App. at 109, 832 S.E.2d at 516. In other words, focusing the occupant inquiry on a defendant's proximity to the house being searched risks conflating the "where" with the "who" inquiry outlined in *Wilson*. As our Court noted, this "would [ ] boundlessly subject to detention any grass-mowing uncle, tree-trimming cousin, or next-door godson checking his mail, merely based upon his 'connection' to the premises and hapless presence in the immediate vicinity." *Id.* at 110, 832 S.E.2d at 516.

- 16 -

Here, "there is no question" that the "when" prong is satisfied because officers detained Defendant during their lawful execution of a warrant. *Id.* at 108, 832 S.E.2d at 515. And we assume without deciding that "the circumstances here satisf[y] the second prong—the 'where'—of the *Summers* rule."[2] *Id.* The critical inquiry in this case, as in *Wilson* and *Thompson*, is whether Defendant posed a threat to the safe and efficient execution of the warrant. We conclude that he did not.

The trial court did not make findings sufficient to support the conclusion that Defendant posed a real threat to the execution of this search warrant. Unlike the defendant in *Wilson*, Defendant made no attempt to penetrate the police perimeter nor did he evince an intent to enter the premises or appear to be armed. The trial court further did not find that Defendant appeared nervous or agitated, made any furtive movement, or disobeyed police commands. *See Thompson*, 267 N.C. App. at 108, 832 S.E.2d at 515 (same factors also absent). By Investigator Dowdy's own admission, Defendant was "simply leaning up against the rail" and did "not take any

---

[2] Defendant was at his grandfather's neighboring property approximately 60 yards away from the premises to be searched. The State has repeatedly claimed in its brief and at oral argument that, based on the testimony of Lt. Raynor, the 60 yards between 8450 and Defendant's grandfather's house was a "five to six second walk," putting Defendant within the "immediate vicinity" of 8450.

Olympian and 11-time world champion Usain Bolt, widely considered to be the greatest sprinter of all time and the fastest human in recorded history, ran the 40-yard dash in 4.22 seconds in 2019. *See Usain Bolt: Biography*, https://www.biography.com/athlete/usain-bolt (last visited 14 December 2020); Andrew Dawson, *Usain Bolt Ties NFL Record in 40-Yard Dash*, *Runner's World* (4 February 2019), https://www.runnersworld.com/news/a26074900/usain-bolt-40-yard-dash/. Given that the fastest man on Earth could not *sprint* 60 yards in six seconds, it stands to reason that Defendant could not *walk* this distance more quickly.

Nonetheless, as we stressed in *Thompson*, even if Defendant was in the "immediate vicinity" of the premises to be searched, that does not mean he was an "occupant" as defined by our Supreme Court in *Wilson*.

action to raise any suspicion of criminal activity on his part[.]" In fact, his behavior was so unremarkable that none of the other 10 officers executing the warrant sought to interact with, let alone detain, Defendant until after Investigator Dowdy did so.

Though the trial court and the dissent reason that Defendant was an occupant because of his "criminal history, his history of use of guns, and his proximity to the house being searched," *Tripp, infra* at ___ (Stroud, J., concurring in part and dissenting in part), this reasoning transgresses controlling precedent in three related ways.

First, focusing the occupant inquiry on Defendant's "proximity to the house being searched" conflates the "where" with the "who" inquiry. In determining the defendant in *Wilson* occupied the premises subject to the search warrant, our Supreme Court did not consider "even in part [ ] either the defendant's 'connection' to the premises or his proximity thereto" despite the fact that "both factors were present[.]" *Thompson*, 267 N.C. App. at 110, 832 S.E.2d at 516 (citing *Wilson*, 371 N.C. at 925, 821 S.E.2d at 815).

Second, as discussed below, Defendant's criminal history, standing alone, does not support a *Terry* stop, which, like a *Summers* detention, is concerned with officer safety.[3] *See State v. Rinck*, 303 N.C. 551, 559, 280 S.E.2d 912, 919 (1981) ("If upon

---

[3] This is not to say the *Terry* and *Summers* tests are the same; it is merely to show that the dissent's arguments could not even serve to clear the relatively low bar of reasonable suspicion. *See State v. Smathers*, 232 N.C. App. 120, 123, 753 S.E.2d 380, 382-83 (2014) ("Reasonable suspicion is a

detaining the individual, the officer's personal observations confirm that criminal activity may be afoot and suggest that the person detained may be armed, the officer may frisk him as a matter of self-protection."); *see also United States v. Black*, 707 F.3d 531, 540 (4th Cir. 2013) ("A prior criminal record is not, standing alone, sufficient to create reasonable suspicion." (brackets and citation omitted)); *United States v. Sandoval*, 29 F.3d 537, 543 (10th Cir. 1994) ("If the law were otherwise, any person with any sort of criminal record—or even worse, a person with arrests but no convictions—could be subjected to a *Terry*-type investigative stop by a law enforcement officer at any time without the need for any other justification at all."); *State v. Bouknight*, 252 N.C. App. 265, 797 S.E.2d 340, 2017 N.C. App. LEXIS 150, at *6 n.6 (2017) (unpublished) ("[R]easonable suspicion cannot rest on the basis of prior criminal activity *alone*.").

All of which points to the dissent's central flaw: failing to grapple with whether Defendant, in this "particular circumstance[,] . . . posed a *real* threat to the safe and efficient execution of the search warrant." *Thompson*, 267 N.C. App. at 110, 832 S.E.2d at 516 (emphasis added) (citation and marks omitted). While it is no doubt true that Defendant could have posed a threat if he had a gun, the trial court's findings do not suggest he was armed on the evening in question, that he had ever

---

less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence. The standard is satisfied by some minimal level of objective justification." (citation omitted)).

been armed around law enforcement, or even that he was known to regularly carry firearms.[4]

Taken to its logical end, the dissent's reasoning would not only hollow out *Summers*, *Wilson*, and *Thompson* but also justify nearly any detention. Particular to this situation, the dissent seems to understand the rule from *Summers* and its progeny as follows: if law enforcement knows an individual has ever used a firearm for allegedly untoward ends, then that person is an "occupant" so long as he or she is within a firearm's range of the warrant execution. But that is not the law. Were there any support for such a capacious reading of the controlling cases, we suspect the dissent would note it. More broadly, the dissent also leans ever so slightly on the Craven County Sheriff Department's warrant execution policy (which cannot establish compliance with constitutional obligations), subtly endorsing the detention and search of "all persons . . . in proximity to our scenes[,]" "with a prior history with us[,]" or "with [a] violent history[.]" *But see Bailey*, 568 U.S. at 197, 133 S. Ct. at 1034 ("A general interest in avoiding obstruction of a search . . . cannot justify detention beyond the vicinity of the premises to be searched."). But, again, *Bailey*, *Wilson*, and

---

[4] While arguing we go beyond our mandate as an appellate court by re-weighing evidence (without ever specifying how), the dissent goes further by disregarding unchallenged (and therefore) binding findings. Seeking to bolster its rickety "true threat" conclusion, the dissent suggests that Investigator Dowdy approached Defendant in part because he knew he "had made a sale of heroin in that same residence to an undercover agent the previous day." *Tripp*, *infra* at ___ (Stroud, J., concurring in part and dissenting in part). This is flatly contrary to the trial court's unchallenged finding that Investigator Dowdy was not aware "of the previous day's felonious sale of heroin to [the] confidential informant."

*Thompson* teach that whether a person poses a "threat" turns on the particular circumstances as well as the particular individual's conduct during the execution of the warrant, not whether the "grass-mowing uncle, tree-trimming cousin, or next-door godson checking his mail . . . in the immediate vicinity" got into a fistfight years ago.[5] *Thompson*, 267 N.C. App. at 110, 832 S.E.2d at 516.

Here, the particular circumstances show that Defendant did not pose a threat to the safe and efficient execution of the search warrant. Thus, Defendant's detention cannot be justified on the grounds that he was an occupant of the premises during the lawful execution of the search warrant.

### iv. *Terry* Investigatory Stop[6]

Defendant next argues that his detention was not a permissible *Terry* stop.

To justify a *Terry* stop, a law enforcement officer must act upon "specific and articulable facts" giving rise to a reasonable suspicion that an individual "was, or was about to be, engaged in criminal activity and . . . was armed and presently dangerous." *State v. Butler*, 331 N.C. 227, 233, 415 S.E.2d 719, 722 (1992) (citing *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889, 906 (1968)). And, as detailed

---

[5] Our point is not that Defendant is the same as the grass-mowing uncle who got into a fistfight years ago; he is not. It is instead to point out the dissent's break with precedent by moving the goalposts from a "real" threat to something far more ephemeral. In so doing, the dissent sweeps up not only Defendant but also the grass-mowing uncle.

[6] The State does not argue before our Court that Defendant's detention and frisk is justified by *Terry*. The *Terry* rationale for Defendant's detention and frisk is thus arguably not before us. *State v. Hardy*, 242 N.C. App. 146, 152 n.2, 774 S.E.2d 410, 415 n.2 (2015) (citing N.C. R. App. 28(a) (2015)) (treating as abandoned issue the State did not raise on appeal). But, given that the trial court's suppression order references *Terry*, we address this issue out of an abundance of caution.

in the above discussion of *Summers*, *Bailey*, and their progeny, a search warrant for a place associated with a person does not, in and of itself, provide reasonable suspicion to search that person.

In an unchallenged mixed finding of fact and conclusion of law, the trial court found and concluded that Investigator Dowdy, who detained Defendant, "was unaware there existed probable cause to arrest the defendant without a warrant." More particularly, Investigator Dowdy was not aware "of the previous day's felonious sale of heroin to [the] confidential informant" and indeed conceded that Defendant did "not take any action to raise any suspicion of criminal activity on his part[.]" And, again, there were no findings to suggest Defendant was armed on the evening in question. Investigator Dowdy therefore had no basis for a *Terry* investigatory stop of Defendant.

### v. Inevitable Discovery

Finally, the State argues that even if evidence was unconstitutionally obtained from Defendant, it would have been admissible under the inevitable discovery doctrine because probable cause existed to arrest Defendant for the prior day's sale of heroin.

Under the inevitable discovery doctrine,

> evidence which would otherwise be excluded because it was illegally seized may be admitted into evidence if the State proves by a preponderance of the evidence that the evidence would have been inevitably discovered by the law

> enforcement officers if it had not been found as a result of
> the illegal action.

*State v. Pope*, 333 N.C. 106, 114, 423 S.E.2d 740, 744 (1992). "The State need not prove an ongoing independent investigation; we use a flexible case-by-case approach in determining inevitability." *State v. Larkin*, 237 N.C. App. 335, 343, 764 S.E.2d 681, 687 (2014).

"Courts have previously considered a discovery of evidence as 'inevitable' where the police have sufficient identifying information about the specific item sought and where it appears that in the normal course of an investigation, the item would have been discovered even without the information that was obtained illegally." *Id.* at 345, 764 S.E.2d at 688. In *State v. Vick*, 130 N.C. App. 207, 219, 502 S.E.2d 871, 879 (1998), during the execution of the warrant, police detained the defendant and asked him, "If we were looking for drugs[,] where would we look[?]" *Id.* at 213, 502 S.E.2d at 875. The defendant replied, "[T]he refrigerator." *Id.* Despite any alleged *Miranda* violation, this Court held the discovery of the cocaine inevitable because officers had a search warrant for narcotics in defendant's home, and the cocaine was "blatantly laying [sic] in the refrigerator." *Id.* at 218, 502 S.E.2d at 878.

Again in *State v. Harris*, 157 N.C. App. 647, 654, 580 S.E.2d 63, 67 (2003), this Court held the discovery of evidence admissible despite any alleged *Miranda* violation when law enforcement asked the defendant "if he had any keys" to open a locked toolbox, the defendant gave the keys to officers, and they opened the box and found

cocaine. *Id.* at 650, 580 S.E.2d at 65. Given there was "no dispute that the officers had a search warrant specifically authorizing them to search defendant's person[,]" this Court held the discovery of the keys (which were located in the defendant's front jeans pocket) was inevitable. *Id.* at 654, 580 S.E.2d at 68.

But in *State v. Wells*, 225 N.C. App. 487, 490-91, 737 S.E.2d 179, 181-82 (2013), this Court rejected an inevitable discovery argument when no evidence was introduced regarding "common practices of the [law enforcement agency] for inventorying [ ] belongings or through testimony regarding continued search efforts in [the] case, indicating that investigating officers would have located" the evidence at issue. *Id.* at 490-91, 737 S.E.2d at 181-82. Though it seemed "entirely logical that the police would search [the location where the evidence was found] and discover" it, "there [was] no evidence in the record to support this assumption." *Id.* at 490, 737 S.E.2d at 181.

Here, unlike in *Vick* and *Harris*, there was no warrant to search or arrest Defendant for the prior day's sale of heroin. Nor were there findings or evidence consistent with concluding that the narcotics "would have been discovered even without the information that was obtained illegally." *Larkin*, 237 N.C. App. at 345, 764 S.E.2d at 688. Lt. Raynor testified that law enforcement had not decided whether they were going to charge or arrest Defendant for the sale on the day that they executed the warrant, explaining that the decision was going to be made *after* the

execution of the warrant. Though Investigator Buck arguably had probable cause to arrest Defendant given his knowledge of Defendant's earlier sale of heroin to a confidential informant, *see* N.C. Gen. Stat. § 15A-401(b)(2)(a) (2019), the trial court found and concluded that Investigator Dowdy detained, searched, and arrested Defendant without that knowledge. Accordingly, the State has not met its burden of showing that it was "more likely than not" that an arrest based on the 25 April 2017 sale of heroin—and a subsequent search of his person—was inevitable. *See Vick*, 130 N.C. App. at 218, 502 S.E.2d at 878; *see also Larkin*, 237 N.C. App. at 346, 764 S.E.2d at 689 (evidence would have been inevitably discovered where search warrant contained a description of the item sought and testimony established that the officer "would have searched for the [item], no matter the location"). Based on Lt. Raynor's testimony, it would be mere speculation to hold otherwise.

B. Clerical Errors on Judgment and Commitment Forms

Lastly, Defendant argues, and the State concedes, that the judgment and commitment forms contain clerical errors.

"When, on appeal, a clerical error is discovered in the trial court's judgment or order, it is appropriate to remand the case to the trial court for correction because of the importance that the record 'speak the truth.'" *State v. Lark*, 198 N.C. App. 82, 95, 678 S.E.2d 693, 702 (2009) (citation and marks omitted). "A clerical error is an error resulting from a minor mistake or inadvertence, especially in writing or copying

something on the record, and not from judicial reasoning or determination." *Id.* (marks, alterations, and citations omitted).

Here, the trial court sentenced Defendant for six offenses: four related to the 26 April 2017 incident that were consolidated into a single 70- to 93-month sentence, and the remaining two related to the 3 May 2017 incident that were consolidated into a separate judgment for 8 to 19 months. The sentences were to run consecutively. However, the trial court entered two judgment and commitment forms that were inconsistent with these oral rulings. The first form includes only three of the four 26 April 2017 convictions and includes one of the 3 May 2017 offenses, possession with intent to sell and deliver fentanyl, as the fourth count. The second form consolidates the 26 April 2017 conviction for receiving stolen goods with the 3 May 2017 charge for possession with intent to sell and deliver heroin.

The forms entered by the trial court therefore conflict with the sentence rendered in open court, and since this is merely a clerical error, we remand to the trial court for entry of a corrected judgment to match that which was announced in court. *See State v. Allen*, 249 N.C. App. 376, 379, 790 S.E.2d 588, 591 (2016) ("If the alleged sentencing error is only clerical in nature, it is appropriate to remand the case to the trial court for correction because of the importance that the record speak the truth." (marks and citation omitted)).

III. Conclusion

For the reasons stated above, we hold that the trial court erred in denying Defendant's motion to suppress and vacate Defendant's convictions for possession with intent to sell or deliver fentanyl and trafficking heroin. We further hold that the judgment and commitment forms contain clerical errors. On remand, the trial court shall resentence Defendant and correct the judgment and commitment forms consistent with this opinion.

VACATED IN PART; REMANDED FOR CORRECTION OF CLERICAL ERRORS.

Judge MURPHY concurs.

Judge STROUD concurs in part and dissents in part by separate opinion.

STROUD, Judge, concurring in part and dissenting in part.

I concur with the majority's opinion as to remand for correction of clerical errors in the judgments. But I must respectfully dissent from the remainder of the majority's opinion reversing the trial court's order denying Defendant's motion to suppress and vacating his convictions for trafficking heroin under file number 17CRS051205 and possession with intent to sell or deliver fentanyl under file number 17CRS000467. I would affirm the trial court's order on the motion to suppress because the trial court's findings of fact are supported by the evidence and those findings demonstrate that Defendant "posed a real threat to the safe and efficient completion of the search." *State v. Wilson*, 371 N.C. 920, 921, 821 S.E.2d 811, 813 (2018) (citing *Bailey v. United States*, 568 U.S. 186, 200-01, 133 S.Ct. 1031, 1041-42, 185 L. Ed. 2d 19 (2013)). And thus, Defendant is included in the definition of an "occupant" based on the totality of the circumstances under *State v. Wilson,* 371 N.C. at 924, 821 S.E.2d at 815.

## I.     Standard of Review

The majority opinion notes that "Defendant challenges several of the trial court's findings of fact as not supported by competent evidence," but "assum[es] without deciding that each of the challenged findings is supported by competent evidence because, even if so, they cannot support Defendant's detention pursuant to either *Summers* or *Terry*."

"Appellate courts are bound by the trial court's findings if

> there is *some* evidence to support them, and may not substitute their own judgment for that of the trial court even when there is evidence which could sustain findings to the contrary." "[A]n appellate court accords great deference to the trial court in this respect [.]"

*State v. Ingram*, 242 N.C. App. 173, 180, 774 S.E.2d 433, 439 (2015) (alterations in original) (citations omitted).

If the trial court's findings of fact are supported by the evidence or unchallenged by the Defendant, this Court may then determine *de novo* if those findings of fact support the conclusions of law:

> When reviewing a trial court's ruling on a motion for appropriate relief, the appellate court must "determine whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court." "If no exceptions are taken to findings of fact [made in a ruling on a motion for appropriate relief], such findings are presumed to be supported by competent evidence and are binding on appeal.'" In such a case, the reviewing court considers only "whether the conclusions of law are supported by the findings, a question of law fully reviewable on appeal."

*State v. Mbacke*, 365 N.C. 403, 406-07, 721 S.E.2d 218, 220 (2012) (alteration in original) (citations omitted).

The majority opinion recites the correct standard of review, citing to *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982), but it did not apply this standard. Instead, the majority essentially considered all of the issues *de novo*. Using the proper standard of review, I would affirm the trial court's order.

*STROUD, J., concurring in part, dissenting in part*

## II.    Findings of Fact

The trial court made detailed findings of fact and Defendant raised several arguments as to the findings.  Since the majority opinion assumes without deciding that the findings of fact are supported by the evidence, it does not address Defendant's arguments regarding the findings.  Although the majority opinion states that it assumed the trial court's findings of fact are supported by the record, its analysis reweighs and reconsiders the evidence and tacitly rejects some of the trial court's findings.  Most relevant to the issues on appeal is its determination that "[t]he trial court did not make any findings consistent with, nor does the record reveal, that Defendant posed a real threat to the execution of this search warrant."  The trial court did make findings addressing the real threat to the execution of the search warrant.  Findings 4 through 8 address the reasons Deputy Dowdy determined Defendant posed a threat to the execution of the warrant.  The majority takes a different view of the evidence than the trial court, but this Court's role is not to re-evaluate the evidence; we are only to determine if the findings of fact are supported by the evidence and if those findings support the conclusions of law.  *See State v. Mbacke*, 365 N.C. at 406-07, 721 S.E.2d at 220.

Upon detailed review of the Defendant's arguments regarding the findings of fact, I would find that all are supported by competent evidence, except for a portion of Finding No. 5.  I will therefore address that finding.  I will also address Findings

No. 7 and 8 as the majority's opinion interprets the evidence regarding the proximity of the two houses differently than the trial court.

A.      Finding of Fact 5

> 5. Deputy Josh Dowdy, a nine year veteran of the sheriff's office and a trained member of the Coastal Narcotics Enforcement Team, participated in the execution of the search warrant. Dowdy understood that the target of the search was the defendant. He knew the defendant from at least three other interventions with the defendant. In 2011 and 2013 he had been called to the defendant's residence due to domestic disturbances in which the defendant had been brandishing a firearm. In 2012 he had arrested the defendant for an assault on a female. At the time of that arrest, he was at his grandfather's house which is located about 60 yards from the residence being searched pursuant to the April 26, 2017 search warrant.

Defendant challenges whether "Deputy Dowdy was 'a trained member of the Coastal Narcotics Enforcement Team[.]'" Deputy Dowdy testified that he is an investigator with the Craven County Sheriff's Office. Finding of fact 5 is not based on competent evidence to the extent it states Deputy Dowdy was a "member" of the Narcotics Enforcement Team, but Defendant does not challenge the remainder of this finding.

B.      Finding of Fact 7

Defendant challenges whether he "had a direct line of sight to [the building to be searched] and the officers on scene." (Alteration in original.) Defendant argues there is no evidence to support this finding, and "photographs introduced into

evidence instead show that there was a large amount of foliage between the two buildings."

Defendant's brief includes a photograph labeled "Def. Trial Ex. 1." The photograph shows the house to be searched, Defendant's grandfather's house, and some plants, perhaps bushes or small trees, in the area between the buildings. The photograph shows a view from the front of the houses, far enough away to show both of them. Defendant argues the bushes between the houses would have blocked the view from one to the other. But Defendant's argument presents an issue of the credibility of Deputy Dowdy and the weight of the evidence. Deputy Dowdy agreed that Defendant's Exhibit 1 depicted the houses where the search occurred, but he was not asked any other questions about his exact position, Defendant's position, where he was when he saw defendant, or the lines of sight between various locations. From the angle in the photograph, it is impossible to see if there are gaps within the planted area, even assuming the leaves were the same on the date of the photograph as on the date of the search. The photograph does not necessarily refute Deputy Dowdy's testimony, and even if it did, this Court generally defers to the trial court's determination on conflicts in the evidence when reviewing denial of a motion to suppress. *See State v. Malone*, 373 N.C. 134, 145, 833 S.E.2d 779, 786 (2019) ("A trial court has the benefit of being able to assess the credibility of witnesses, weigh and resolve any conflicts in the evidence, and find the facts, all of which are owed great

deference by this Court." (citing *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619-20 (1982))). The presence of bushes or trees between the buildings does not refute Deputy Dowdy's testimony that he could see Defendant standing on the wheelchair ramp at his grandfather's house. Investigator Buck also testified that he observed several people at Defendant's grandfather's house before entering the building to be searched. In addition, Investigator Buck later observed Deputy Dowdy walking toward the property to be searched from Defendant's grandfather's house. The trial court's finding regarding Defendant's line of sight to the residence and the officers on scene is supported by competent evidence.

C.     Finding of Fact 8

"Defendant challenges [Finding of Fact 8] to the extent it is inconsistent with Deputy Dowdy's concession that he believed he was searching Mr. Tripp pursuant to the search warrant." Defendant does not challenge this finding as unsupported by competent evidence, but rather argues it is not consistent with Deputy Dowdy's testimony. Finding of Fact 8 states:

> As Deputy Dowdy was getting out of his motor vehicle he observed the defendant to his right near the front porch of the defendant's grandfather's house. Because of his past experiences with the defendant, his previous firearm possessions, and the reasons that brought law enforcement to this residence, Dowdy asked him to put his hands on the railing of a handicap ramp attached to his grandfather's house so he could "pat" him down for weapons. It was the policy and normal procedure of the Sheriff's Office for the safety of the officers and those present to pat down all

individuals with whom they made contact while executing a search warrant. The defendant complied.

"The trial court's findings of fact on a motion to suppress 'are conclusive on appeal if supported by competent evidence, even if the evidence is conflicting.'" *State v. Williams*, 366 N.C. 110, 114, 726 S.E.2d 161, 165 (2012) (quoting *State v. Eason*, 336 N.C. 730, 745, 445 S.E.2d 917, 926 (1994)). Deputy Dowdy acknowledged he thought Defendant was a subject of the search warrant. However, based upon Deputy Dowdy's testimony and the trial court's findings of fact, he searched Defendant to secure the safety of the scene, due to his prior encounters with Defendant, and his knowledge of Defendant's criminal history. This finding is supported by competent evidence.

III.    Conclusions of Law

Since all of the trial court's findings of fact are supported by the evidence except for the one minimal challenged portion of Finding of Fact 5, I will address Defendant's arguments that the trial court's conclusions of law are not supported by the findings of fact.

A.    Conclusion of Law 5

Defendant argues he was not an occupant of the "premises searched," and "[t]o the extent this is a finding of fact, defendant challenges it as unsupported by the record."

This Court does "not base our review of findings of fact and conclusions of law on the label in the order, but rather, on the substance of the finding or conclusion." *State v. Johnson*, 246 N.C. App. 677, 683, 783 S.E.2d 753, 758 (2016). To the extent Defendant challenges that he was not an "occupant" of the premises searched, the trial court's findings address the fact that the property was his residence, at least part of the time, as he also spent time at another residence in a trailer park. But in the context of a search warrant, the term "occupant" has a different meaning than someone who lives in a particular residence.

> Our Supreme Court in *Wilson* identified three prongs to the rule: "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain (1) the occupants, (2) who are within the immediate vicinity of the premises to be searched, and (3) who are present during the execution of a search warrant." "These three parts roughly correspond to the 'who,' 'where,' and 'when' of a lawful suspicionless seizure incident to the execution of a search warrant."

*State v. Thompson*, ___ N.C. App. ___, ___, 832 S.E.2d 510, 513–14 (2019) (citation omitted) (quoting *State v. Wilson*, 371 N.C. 920, 924, 821 S.E.2d 811, 815 (2018)). "The Court ultimately concluded that a person is an 'occupant' for purposes of the rule 'if he poses a real threat to the safe and efficient execution of a search warrant.'" *Id.* at ___, 832 S.E.2d at 514. This determination is a conclusion of law. *See id.*

At trial, Lt. Raynor testified about the policy:

Q. And can you tell the Court what that [policy] is?

A. My policy-- execution of search warrants, all persons on scene or in proximity to our scenes that we believe to be a threat are dealt with, which means that we will detain them briefly, pat them down for weapons, make sure they're not a threat to us and then one of the narcotics investigators on scene will make a determination if that person can leave or not. If they're gonna stay due to the fact they're in the residence where narcotics are found or if at that point when they're no longer deemed a threat to us, they can be released from the scene and can go.

Q. And what types of things do you consider as far as whether someone who'd be deemed a threat to you when you're executing a search warrant?

A. Anyone with prior history with us, with violent history, known to carry guns, any known drug dealers that we have past history with. By nature, generally drug dealers are considered violent and by nature a majority carry guns in one nature or another, so everybody inside of a known narcotics residence or on the scene there we deal with for our safety purposes, then deem whether or not they're suspect at that point to continue further.

Certainly, the law enforcement policy alone does not eliminate any constitutional objections to the application of the policy. The fact that a person has used a firearm in the past, taken in isolation, would not make a person an "occupant" subject to a detention or search. In this case, many factors relevant to the potential threat to the officers executing the warrant were present and noted in the trial court's findings. And an officer's violation of the policies of his law enforcement agency could be a factor weighing in favor of a defendant's challenge to a search. But in this case, Deputy Dowdy's frisk of Defendant fell within the requirements of the policy. Even

though Defendant was approximately sixty yards away from the house being searched, there were eleven officers conducting the search, and Deputy Dowdy saw Defendant on his grandfather's porch after parking his vehicle in front the residence being searched.  In addition, Defendant was clearly close enough to the search and the officers to pose an immediate threat if he had a gun.  Based upon Defendant's criminal history, his history of use of guns, and his proximity to the house being searched, Defendant was an "occupant" because "he pose[d] a real threat to the safe and efficient execution of a search warrant." *Id.* at ___, 832 S.E.2d at 514.

The majority opinion focuses on a few facts—such as how far a person could possibly run within five or six seconds—in determining that Defendant did not pose a "real threat to the safe and efficient execution" of the search warrant.  I agree Defendant was not capable of walking, or running, sixty yards within five or six seconds.  But the typical bullet from any type of handgun or rifle travels this distance in a fraction of a second.  If Defendant had a gun, the law enforcement officers executing the warrant could have been in peril; Defendant would not have to run faster than Usain Bolt to endanger their lives.  And Deputy Dowdy's concern was *not* that Defendant would run to the house being searched; his concern was the possibility Defendant may have a gun, based upon his extensive past experience with Defendant. *See Michigan v. Summers*, 452 U.S. 692, 702-03, 101 S. Ct. 2587, 2594 (1981) ("Less obvious, but sometimes of greater importance, is the interest in minimizing the risk

of harm to the officers. . . . [T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.").

Deputy Dowdy testified he had responded to three prior calls involving Defendant. In 2011, he responded to a call from Defendant's mother, who reported a domestic dispute where Defendant was "waving a firearm around." The officers did not find the firearm where Defendant's mother had reported, but Defendant then told the officers where it was, and they found it "under the pillow where a baby was also on the bed" and "seized it for safekeeping." In 2012, Deputy Dowdy "arrested [Defendant] at his grandfather's house for an assault on a female warrant." In 2013, Deputy Dowdy responded to a report that Defendant was "walking down the road with a shotgun." This report was from the "same address with same two parties," at the residence "down the path from 8420." When the officers arrived, they walked "down the path towards where [Defendant] was going to, which was his grandfather's house." They ultimately found the gun at "[Defendant's] residence back at 8420." Defendant told Deputy Dowdy that he "shot a shotgun in the air to scare her," after an altercation.

I agree with the majority that "'an individual's presence within the immediate vicinity of a search' cannot operate categorically to pose 'a threat to the search's safe

and efficient execution.'" But in this situation, the majority holds that law enforcement officers should have assumed Defendant posed no threat to their safety, even though his own residence was being searched, a day after he had made a sale of heroin in that same residence to an undercover agent the previous day,[7] and even though they knew he had previously possessed guns and fired guns in domestic disputes. Defendant was simply not comparable to "any grass-mowing uncle, tree-trimming cousin, or next-door godson checking his mail" who was searched "merely based upon his 'connection' to the premises and hapless presence in the immediate vicinity." *Thompson,* ___ N.C. App. at ___, 832 S.E.2d at 516. Neither *Summers* nor *Wilson* requires the law enforcement officers to wait until a person near the scene of a search attempts to enter the residence or displays a weapon before they are considered a "real threat to the safe and efficient execution of a search warrant." *See id.* at ___, 832 S.E.2d at 515-16.

B. Conclusion of Law 6

Defendant argues, "[t]o the extent this is a finding of fact, it is unsupported by the record to the extent it implies Dowdy believed the baggie contained narcotics based solely on his initial visual observation, for the reasons stated above." As noted above, the majority has taken all of the findings of fact as supported by the record,

---

[7] The trial court found that Deputy Dowdy chose to approach Defendant in part due to "the reasons that brought law enforcement to this residence[.]"

and I would conclude the challenged portion of this mixed finding of fact and conclusion of law is supported by competent evidence.

## IV. Detention

Defendant does not challenge a specific conclusion of law on this issue but argues his detention by Deputy Dowdy was unlawful:

> Deputy Dowdy's decision to detain Mr. Tripp violated the Fourth Amendment and the North Carolina Constitution. It is unclear whether the trial court considered Mr. Tripp's detention an investigatory stop under *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868 (1968), or a detention under *Michigan v. Summers*, 452 U.S. 692, 101 S.Ct. 2587 (1981). Regardless, Dowdy was not permitted to detain Mr. Tripp under either line of cases.

I review this conclusion of law *de novo,* but this review must be based upon the trial court's findings of fact. *State v. Hughes*, 353 N.C. 200, 208, 539 S.E.2d 625, 631 (2000).

In *Michigan v. Summers*, the United States Supreme Court concluded "for Fourth Amendment purposes, we hold that a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." 452 U.S. at 705, 101 S. Ct. at 2595 (footnotes omitted). The United States Supreme Court further defined the spatial constraints of a detention subject to a search warrant in *Bailey v. United States*:

A spatial constraint defined by the immediate vicinity of the premises to be searched is therefore required for detentions incident to the execution of a search warrant. The police action permitted here—the search of a residence—has a spatial dimension, and so a spatial or geographical boundary can be used to determine the area within which both the search and detention incident to that search may occur. Limiting the rule in *Summers* to the area in which an occupant poses a real threat to the safe and efficient execution of a search warrant ensures that the scope of the detention incident to a search is confined to its underlying justification. Once an occupant is beyond the immediate vicinity of the premises to be searched, the search-related law enforcement interests are diminished and the intrusiveness of the detention is more severe.

568 U.S. 186, 201, 185 L. Ed. 2d 19 (2013).

Our Supreme Court in *Wilson* identified three prongs to the rule: "a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain (1) the occupants, (2) who are within the immediate vicinity of the premises to be searched, and (3) who are present during the execution of a search warrant." "These three parts roughly correspond to the 'who,' 'where,' and 'when' of a lawful suspicionless seizure incident to the execution of a search warrant."

Our Supreme Court in *Wilson* applied the *Summers* rule and rejected the defendant's challenge to the trial court's denial of his motion to suppress. In that case, the defendant had arrived on the scene while the Winston-Salem Police Department was in the process of actively securing a home in order to execute a search warrant. The defendant penetrated the perimeter securing the scene, walked past an officer, and announced that he was going to retrieve his moped. After disobeying the officer's command to stop, the defendant proceeded down the driveway toward the home, at which point officers detained and frisked him. Officers recovered a firearm, and the defendant was charged with possession of a firearm by a felon.

*STROUD, J., concurring in part, dissenting in part*

In determining whether the defendant had been lawfully seized under the *Summers* rule, our Supreme Court noted that the application of the second and third prongs was "straightforward," and thus focused its inquiry on the first prong, i.e., whether the defendant's brief detention was justified on the ground that he was an "occupant" of the premises during the execution of a search warrant.

The United States Supreme Court adopted the *Summers* rule based in part upon the rationale that "[i]f the evidence that a citizen's residence is harboring contraband is sufficient to persuade a judicial officer that an invasion of the citizen's privacy is justified, it is constitutionally reasonable to require that citizen to remain while officers of the law execute a valid warrant to search [her] home." Our Supreme Court noted, however, that beyond enumerating the governmental interests that combine to justify a *Summers* detention, the United States Supreme Court had yet to "directly resolve[ ] the issue of who qualifies as an 'occupant' for the purposes of the . . . rule."

In attempting to answer this question, the *Wilson* Court examined the various rationales underlying the Summers rule. The Court ultimately concluded that a person is an "occupant" for purposes of the rule "if he poses a real threat to the safe and efficient execution of a search warrant." Thus, under this formulation of the rule, our Supreme Court noted that although a defendant may not be "an occupant of the premises being searched in the ordinary sense of the word," the defendant's "own actions" may nevertheless "cause[ ] him to satisfy the first part, the 'who,'" of a lawful Summers detention.

Applying this definition, although the defendant was not inside the premises when the officers arrived to execute the search warrant, our Supreme Court concluded that the defendant's own actions had nevertheless rendered him an "occupant," thereby subjecting him to a suspicionless seizure incident to the lawful execution of the search warrant.

*State v. Thompson*, ___ N.C. App. at ___, 832 S.E.2d at 513-14 (alterations in original) (citations omitted).

When officers arrived at Defendant's property to execute the search warrant, Defendant was watching from approximately sixty yards away at his grandfather's house. He was close enough to be "within the immediate vicinity of the premises to be searched." *Id.* at ___, 832 S.E.2d at 513. Based on the specific facts of this case, I would hold Defendant was within the area that "poses a real threat to the safe and efficient execution of a search warrant." *Id.* at ___, 832 S.E.2d at 514. Accordingly, Defendant was lawfully detained by Deputy Dowdy.

## V.      Frisk

Defendant argues that [e]ven if Deputy Dowdy's seizure of Mr. Tripp was justified, his frisk was not." "Before Dowdy could frisk Mr. Tripp, he was required to have some specific, articulable facts suggesting Mr. Tripp was armed and presently dangerous. Because Dowdy knew of no such facts, all evidence discovered through the frisk must be suppressed even if Mr. Tripp's detention were lawful."

> In *Terry v. Ohio*, the Supreme Court determined that a brief stop and frisk did not violate a defendant's Fourth Amendment rights when "a reasonably prudent man would have been warranted in believing [the defendant] was armed and thus presented a threat to the officer's safety while he was investigating his suspicious behavior." In other words, an officer may constitutionally conduct what has come to be called a *Terry* stop if that officer can "reasonably . . . conclude in light of his experience that criminal activity may be afoot." "The reasonable suspicion

standard is a 'less demanding standard than probable cause' and 'a considerably less [demanding standard] than preponderance of the evidence.'" To meet this standard, an officer "must be able to point to specific and articulable facts" and to "rational inferences from those facts" justifying the search or seizure at issue. "To determine whether reasonable suspicion exists, courts must look at 'the totality of the circumstances' as 'viewed from the standpoint of an objectively reasonable police officer.'"

*State v. Wilson*, 371 N.C. 920, 926, 821 S.E.2d 811, 812 (alterations in original) (citations omitted).

Here, Deputy Dowdy testified about three prior interactions with Defendant, and the trial court made findings noting these interactions. On one of these occasions, Defendant told Deputy Dowdy that he fired a shotgun in the air to scare his partner, and on a separate occasion officers retrieved a firearm from Defendant's residence for safekeeping, and the trial court's Finding of Fact 5 references these interactions:

> He knew the defendant from at least three other interventions with the defendant. In 2011 and 2013 he had been called to the defendant's residence due to domestic disturbances in which the defendant had been brandishing a firearm. In 2012 he had arrested the defendant for an assault on a female.

The trial court found Deputy Dowdy's past experiences in addition to his safety and the sheriff's office policy to be relevant to his decision to frisk Defendant:

> 8. As Deputy Dowdy was getting out of his motor vehicle he observed the defendant to his right near the front porch of the defendant's grandfather's house. Because of his past experiences with the defendant, his previous firearm possessions, and the reasons that brought law enforcement

> to this residence, Dowdy asked him to put his hands on the railing of a handicap ramp attached to his grandfather's house so he could "pat" him down for weapons. It was the policy and normal procedure of the Sheriff's Office for the safety of the officers and those present to pat down all individuals with whom they made contact while executing a search warrant. The defendant complied.

Here, the sheriff's office was conducting a search at a location where the previous day, Defendant had sold drugs in a controlled buy at the residence to be searched. Deputy Dowdy was aware of Defendant's reputation in the community as a drug dealer, and he had personal experience with calls involving domestic violence and firearms in some of those instances. Defendant was close enough to the officers conducting the search to pose a threat to them, particularly if he had a gun. Based on the totality of the circumstances, I would conclude that "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry v. Ohio*, 392 U.S. 1, 27, 20 L. Ed. 2d 889 (1968).

## VI. Plain View Doctrine

Defendant makes two arguments in support of his position that, "the seizure of narcotics from [Defendant's] pocket was not justified by the 'plain view' doctrine." "First, Dowdy did not see or feel the bag "from a place where he has legal right to be[.]" (Alteration in original.) And second, "even if Dowdy had been allowed to enter the neighboring yard and seize [Defendant], Dowdy never claimed that upon seeing the bag, it was 'immediately apparent' it contained narcotics. Instead, he testified he

saw the bag, and that while patting [Defendant] down, he felt an associated lump that made him believe the bag contained narcotics."

"Under the plain view doctrine, a warrantless seizure is lawful if (1) the officer views the evidence from a place where he has legal right to be, (2) it is immediately apparent that the items observed constitute evidence of a crime, are contraband, or are subject to seizure based upon probable cause, and (3) the officer has a lawful right of access to the evidence itself." *State v. Alexander*, 233 N.C. App. 50, 55, 755 S.E.2d 82, 87 (2014) (citing *State v. Nance*, 149 N.C. App. 734, 740, 562 S.E.2d 557, 561-62 (2002)).

Here the trial court found:

> 9. The defendant was wearing baggy jogging pants. While patting him down Dowdy could feel what he thought was money in his left pocket. Because his pants were so "baggy", Dowdy could see, without manipulating the garment, a plastic baggie in his right pants pocket, and while patting him down he felt a large lump associated with that baggie. His training and experience allowed him to reasonably conclude that the plastic baggie in the defendant's pocket contained narcotics. As a result Dowdy removed the bag and its contents. Dowdy had concluded that the plastic baggie was consistent with how narcotics are carried and packaged. He was also acutely aware of the reasons that they were searching the defendant's residence.

As to Defendant's first argument, because I would hold that Defendant was within the area that "poses a real threat to the safe and efficient execution of a search warrant," *State v. Thompson*, ___ N.C. App. at ___, 832 S.E.2d at 514, I would

conclude Deputy Dowdy was in a place he had the legal right to be. Defendant's second argument is that because Deputy Dowdy saw the bag and then felt it before determining it to be consistent with narcotics, it was not "immediately apparent" as narcotics. I disagree and would conclude that even though Deputy Dowdy did not himself use the words "immediately apparent," his actions and testimony make it clear that this is a situation where it was "immediately apparent that the items observed constitute evidence of a crime, [or] are contraband . . . ." *State v. Alexander*, 233 N.C. App. at 55, 755 S.E.2d at 87. Deputy Dowdy's warrantless seizure of the drugs in Defendant's pocket was subject to the plain view doctrine. *See Minnesota v. Dickerson*, 508 U.S. 366, 375-76, 124 L. Ed. 2d 334, 375-376 (1993) ("If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons.").

## VII. Additional Arguments

Because I would hold the trial court did not err by denying Defendant's motion to suppress, I need not address Defendant's argument regarding inevitable discovery.

## VIII. Conclusion

For the foregoing reasons, I would hold the trial court did not err in denying Defendant's motion to suppress. However, there are clerical errors on Defendant's

*STROUD, J., concurring in part, dissenting in part*

judgment and commitment forms, and I concur in the majority opinion as to remand for correction of the clerical errors.